Robert C. FOCKE, Executor of the Estate of Jerry P. Bent, deceased; Connie Lou Bent; and Cynthia Lou Bent, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Connie Lou BENT, Mother and natural guardian of Robert Paul Bent and Lisa Bent, Minor children; and Cynthia Lou Bent, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. 77–4121, 79–4101.

United States District Court, D. Kansas.

March 22, 1982.

Gene E. Schroer, Topeka, Kan., for plaintiffs.

Jim J. Marquez, U.S. Atty., Mary K. Briscoe, Asst. U.S. Atty., Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

These consolidated cases present claims under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* These cases were tried to the court, sitting without a jury, beginning on February 3, 1981. The court is now prepared to issue findings of fact and conclusions of law.

These cases arise from certain incidents that occurred at the Veterans Administration Hospital (hereinafter referred to as "V.A. Hospital") in Topeka, Kansas, during the years 1974 and 1975. On June 23, 1977, Jerry Bent, his wife, Connie Lou Bent and their daughter, Cynthia Lou Bent filed Case No. 77–4121. The complaint stated three causes of action—one on behalf of each of the plaintiffs. The essence of the complaint was that the defendants (Veterans Administration[1] and United States of America) had negligently hired, trained and supervised Theodore Gano, an employee of

---

1. On March 20, 1979, upon motion of defendant United States of America, we dismissed the Veterans Administration from this action.

the V.A. Hospital, who had provided improper psychiatric services while plaintiff Jerry Bent was being treated there.[2] Jerry Bent committed suicide soon after the action was filed and the executor of his estate, Robert C. Focke, was substituted as a party plaintiff. Thereafter, plaintiffs sought to amend their complaint in two respects. First, plaintiffs sought to add a fourth cause of action—a claim for $5,000,000 in damages on behalf of Cynthia Bent for the death of her father. Second, whereas the original complaint complained of the hiring, training, supervision and performance of Theodore Gano, the proposed amended complaint made the same claims concerning Dr. German Puerta, another employee of the V.A. Hospital who handled Jerry Bent's case.

Subsequently, on May 24, 1979, plaintiffs filed another action, Case No. 79–4101. In this case, Connie Bent, on behalf of the Bent's minor children, Robert Paul and Lisa; and Cynthia Bent brought suit against the United States of America for the wrongful death of Jerry Bent and sought damages in the amount of $5,000,000. On August 23, 1979, we granted plaintiffs' motion to amend in Case No. 77–4121. Thereafter, we consolidated the two cases for trial.

Defendant has consistently contended from the outset of this action that the gravamen of plaintiffs' complaints are the sexual acts committed by Gano upon Connie and Cynthia Bent. Defendant asserts that absent the occurrences of these incidents, there would be no cause of action for plaintiffs to pursue. Accordingly, defendant has asserted that recovery under the Federal Tort Claims Act is barred for the following reasons. First, defendant argues that this court is without jurisdiction to consider these consolidated cases because they arise out of acts beyond the scope of the employment of the federal employees involved. Second, defendant asserts that these cases are barred because they fall within the battery and misrepresentation exceptions to the Federal Tort Claims Act. The defendant relied upon these arguments in a motion for summary judgment filed herein. In denying defendant's motion, we concluded:

Although the incidents of sexual conduct are certainly the most flagrant examples of misconduct by Ted Gano, and may very well be barred by the defenses [especially the "scope of conduct" and "battery" defenses] raised by defendant, the Court is inclined to agree with plaintiffs that this case *may* very well involve more than those claims. Plaintiffs have pleaded this case in such a manner as to stress claims of negligence and malpractice. They have argued the case by minimizing the incidents of sexual misconduct and emphasizing the lack of training and supervision of Gano and Puerta and other examples of alleged negligence. The Court believes that plaintiffs have framed the case as one primarily for negligence and malpractice and are entitled to present the case, as framed, at trial.

The court has now heard all the evidence and the parties have since amplified their arguments on the aforementioned issues in their trial briefs and in their closing arguments. The defendant has also raised two other issues which the court shall consider at this time. First, defendant argues that the allegations made against Dr. German Puerta should be dismissed for failure to exhaust administrative remedies. Second, defendant contends that if the plaintiffs should obtain judgment, then the Veterans Administration benefits previously awarded to them should be set-off against their recovery. In addition, the court, after the trial of this matter and during the period in which this action was under advisement, raised another potential issue with the parties. The court requested that the parties

---

**2.** The court has some independent knowledge of the events surrounding this case, for during the course of the treatment of Jerry Bent, Gano, utilizing his position as a social work associate, convinced both Connie and Cynthia Bent to have sexual intercourse with him. Gano was convicted in this court on February 20, 1976, of having sexual intercourse with a minor (Cynthia). *See United States v. Gano,* 560 F.2d 990 (10th Cir.1977).

advise them on the possible application of the Kansas comparative negligence statute to the facts here. This brought forth, in addition to the parties' views on the issue, several motions for the court's determination.

As the court has acknowledged to the parties during the course of this litigation, this action presents us with a plethora of difficult factual and legal issues. The trial of the cases added several further complications. This occurred because two of the principal players in this scenario were unavailable to testify at trial. Both parties issued a summons for Theodore Gano but he could not be located during the course of the trial. Dr. German Puerta returned to his native South America in 1978 and thus was unavailable for trial. The parties did, however, present the court with depositions of each of these individuals. In each instance, the parties submitted two depositions for both Gano and Dr. Puerta. The depositions of Dr. Puerta contain several inconsistencies and leave several questions unanswered. The depositions of Gano are even further confusing and troublesome. The first deposition of Gano was taken in a state court action brought by the instant plaintiffs prior to this court's trial of Gano on criminal charges. The instant defendant was not involved in the taking of that deposition. The deposition of Gano taken in this action occurred on February 14, 1979, after Gano's conviction in the criminal matter. Each deposition, in the court's view, takes a slightly different perspective of the events that occurred at the V.A. Hospital. This incongruence adds to the difficulty faced by the court in reaching the truth of what actually happened at the hospital.

With the above considerations in mind and after a thorough review of the evidence presented during the course of the trial, the court makes the following findings of fact and narrative conclusions of law.

## FINDINGS OF FACT

1. Jerry P. Bent entered active duty in the United States Army on July 22, 1963. During active duty, Jerry Bent was a dentist in the Dental Corps. He achieved the rank of major prior to his release from active duty.

2. In August, 1969, Jerry Bent was married to Connie Lou Bent, following a divorce from his first wife.

3. Connie Lou Bent, when married to Jerry Bent in 1969, was a widow with two children, Cynthia Lou, age 9, and Robert Paul, age 8. Cynthia and Paul were later adopted by Jerry Bent.

4. In September, 1970, Lisa Bent was born to the marriage of Jerry and Connie Bent.

5. During active duty in the Army, Jerry Bent was stationed in Korea, Vietnam, Hawaii, and Missouri.

6. In 1970, Jerry Bent began an oral surgery training program at Walter Reed Army Hospital in Washington, D.C. He was later transferred to Fitzsimons Army General Hospital in Denver, Colorado, and he continued his training as a resident in the oral surgery program.

7. In June, 1971, as a second year resident, Jerry Bent was placed on probation by his superiors because of unsatisfactory work performance. This action triggered certain "strange behavior" by Jerry Bent and he was subsequently admitted to the psychiatric services unit at Fitzsimons for evaluation. After a thorough psychiatric examination, it was determined that Jerry Bent should be removed from the residency program and placed in a less stressful situation within the Dental Corps.

8. Another psychiatric evaluation was performed on Jerry Bent at Letterman Army General Hospital on September 7, 1971, in San Francisco, California. Jerry Bent was diagnosed as a schizophrenic and once again it was recommended that he withdraw from the oral surgery residency program and be placed in a less stressful situation in practicing dentistry.

9. In December, 1971, Jerry Bent was transferred to Fort Leonard Wood, Missouri. He was placed in the endodontic service

and was trained for six months. He was then assigned to the base dental clinic to perform routine endodontic services. Thereafter, Jerry Bent began a period of irregular attendance at work. In addition, his appearance became slovenly. He became unable to cope with day-to-day stresses and began to experience family problems.

10. In 1972, at Fort Leonard Wood, Jerry Bent began weekly outpatient psychiatric therapy sessions. Subsequently, Connie Bent joined her husband in these therapy sessions. Later, family therapy sessions were held with the focus being on family conflict and nuclear conflicts rather than on Jerry Bent's individual difficulties.

11. During the time they were stationed at Fort Leonard Wood, the Bents experienced increased family problems. In 1972, Jerry Bent experienced problems with impotency and Jerry and Connie Bents' sex life became nonexistent. In addition, several violent incidents occurred during this period. Jerry Bent kicked his wife so violently that she suffered a dislocated tailbone. Subsequently, he was admitted to the hospital at Fort Leonard Wood because of his mental problems. Connie Bent described the last few months at Fort Leonard Wood as "rough." On July 22, 1974, the following was reported in Jerry Bent's army medical file by Dr. Henderson at Fort Leonard Wood:

> He continues to not show evidence of hallucinations or delusions but he continues to withdraw from contact with other members of his family unless initiated by his family, and stopped seeing his friends. He has continued to work on a minimal level with several complaints about his dress, attitude and behavior being reported to his superiors. During his hospitalization and over the last several months he has had numerous somatic complaints variously diagnosed as fatigue, nervousness, neurosis, somatic disease or laziness. He appears to be indifferent to his environment and at times has reacted to his family with rage.

12. In September, 1974, Jerry Bent was determined to be 100% disabled due to his mental problems. As a result, he was placed on the temporary disability retired list.

13. Upon the recommendation of the doctors at Fort Leonard Wood, Jerry Bent came to the Veterans Administration Hospital in Topeka, Kansas, for treatment.

14. On August 29, 1974, Jerry Bent was admitted to the V.A. Hospital in Topeka. He was placed in psychiatric ward 4–2C in Building Four at the hospital.

15. In July, 1974, Theodore J. Gano was employed as a social work associate at the V.A. Hospital in Topeka. Gano had previously graduated *cum laude* from Kansas State University in May, 1974, with a bachelor of arts degree in sociology. His prior work experience included volunteer counseling and research assistance in a drug and alcohol treatment program at Fort Riley, Kansas.

16. On June 4, 1974, Gano completed a civil service application. Gano was then placed on a list of civil service eligibles. As a result, his availability came to the attention of the personnel office of the V.A. Hospital.

17. In July, 1974, Gano was interviewed by two individuals at the V.A. Hospital for the position of social work associate. Verd Holsteen, Chief of Social Work Services, interviewed Gano for approximately one hour concerning the position. During this interview, Holsteen asked Gano about his educational background and his prior work experience. He informed Gano about the duties and responsibilities of the position of social work associate. Holsteen was looking for an individual who had the ability to talk with people and show some concern for their problems. Phyllis Martin, Assistant Chief of Social Work Services, also interviewed Gano for approximately one hour concerning the position. The V.A. Hospital did not attempt to verify the information provided by Gano but rather relied upon the background check which was customarily conducted by the Civil Service Commission. On July 7, 1974, after a dis-

cussion with Ms. Martin, Verd Holsteen hired Gano as social work associate.

18. The position of social work associate had been in existence at the V.A. Hospital in Topeka since 1971. The job required a bachelor's degree in certain disciplines such as social welfare, sociology, psychology, education, history or English. No prior job experience was required nor were any skills in social work required. Gano met the requirements for the position with his degree in sociology. The job description for social work associate stated:

I. PRINCIPAL DUTIES AND RESPONSIBILITIES

I perform a variety of duties in support of professional social workers, providing assistance and service under the supervision of and in coordination with professional social workers. Work performed is limited to services which require beginning application of social work knowledge, methods and techniques at a training level.

Basic duties and responsibilities include direct service to selected individuals in collaboration with the social worker to implement the social worker's objectives for the patient; or total service to patients in which the social worker objectives can be achieved by use of knowledge and skills for which I have been trained. Also, I perform miscellaneous services necessary to facilitate the operation of Social Work Service and particularly the unit to which I am assigned. Some specific examples of duties and responsibilities are:

1. Routine concrete services such as financial assistance referrals, including interviewing the patient and/or his family.

2. Participation in the process of placement of patients requiring nursing home or foster home care upon termination of hospital treatment.

3. Participation in the evaluation process of patients for domiciliary placement following hospitalization.

4. Additional discharge referrals where no unusual medical or psycho-social problems are involved and which include referrals to employment agencies, etc.

5. Handling telephone or written requests to and from community agencies requesting or furnishing routine information on patients and their families.

6. Interpreting and providing information to the resident physician for developing the aid and attendance form so as to facilitate the discharge of a patient.

7. Informing community agencies such as Department of Social Welfare and probation officers of the patient's discharge when necessary to the patient's welfare or necessary from the standpoint of our relationship with other social agencies in the community.

8. C-file reviews, preparation of abstracts from medical charts, preparation of individual departmental statistics and appropriate recording of social work activities.

The above duties require effective collaboration with the ward physician, nurse, and other personnel.

19. Personnel of the hospital believed the tasks of a social work associate to generally involve menial, technical work and did not include therapy or counseling. Social work associates were often used to gather information about a patient or his family for social work purposes. It was not unusual for a social work associate to meet with a family collectively or to meet with members of a family individually to gather such information.

20. The general supervision of a social work associate was conducted by a social worker. The job description stated the supervisory controls over the position as follows:

Direct supervision is provided by the Supervisory Social Worker of the unit to which I am assigned. Cases are referred from social workers within the unit and may be screened by my supervisor for

suitability of the request and whether I have the specific training required for the task. Regularly scheduled supervisory conferences are supplemented by frequent unscheduled conferences for immediate guidance and direction. Normally, I do not make technical decisions independently. However, routine or familiar phases of work are performed with less guidance from my supervisor.

All social workers at the hospital were in turn under the supervision of Verd Holsteen, Chief of Social Work Service.

21. Upon employment, Gano was placed on a one year probationary period, as was customary for new social work associates. Vance Mellen was designated as Gano's supervisor. In order to be a social work supervisor, it was necessary to have a master's degree in social work and to have two years of clinical work.

22. Gano went through a two to three week orientation period after employment. He then started on a 100 hour training program which was required of all social work associates. This program consisted of a general orientation to the V.A. Hospital and to the field of social work. Gano had completed approximately 44 hours prior to his resignation. In addition, Gano completed "tiger training" on December 4, 1974. "Tiger training" is a twenty-four hour program conducted over a three day period operated by the Chief of Psychology at the V.A. Hospital used to improve the functioning of the various disciplines within the hospital. Gano also received on-the-job training from his supervisors. This training included reviewing his written work, observing his interviewing skills, and checking his understanding of his cases.

23. Gano was provided with his own office immediately after he was hired.

24. In July, 1974, Dr. German Puerta began participation in the psychiatric residency program at the Menninger Foundation in Topeka, Kansas. As part of this program, Dr. Puerta was assigned to the V.A. Hospital in Topeka for a one year period. Menningers and the V.A. Hospital had had a long running agreement for the placement of doctors participating in the Menninger program. During the one year period, Dr. Puerta was assigned, as was customary, to an in-patient psychiatric ward at the hospital in order to become familiar with psychiatric principles and diagnoses. Psychiatric residents, prior to their completion of the program, were generally not qualified to conduct family or marital therapy. While working at the V.A. Hospital, Dr. Puerta received educational training at Menningers.

25. Dr. Puerta had graduated from Javeriana University in Bogota, Colombia with a medical degree in 1968. Subsequently, he had received four or five months of psychiatric training during an internship at Lutheran Medical Center in St. Louis, Missouri, prior to his participation in the Menninger Foundation program.

26. Participants in the Menninger program were placed at the V.A. Hospital by the executive committee of the Menninger School of Psychiatry. After selection as a student in the School of Psychiatry, a doctor underwent various interviews and tests to determine if the individual was a suitable candidate to become a resident at the V.A. Hospital. Dr. Puerta successfully completed these requirements and began work at the V.A. Hospital in July, 1974.

27. Dr. Puerta was supervised during his period at the V.A. Hospital by Dr. Charles Marsh. Dr. Marsh was appointed by the Menninger School of Psychiatry to supervise Dr. Puerta. Dr. Marsh had graduated from the Menninger School of Psychiatry in 1967 and had been a practicing psychiatrist at the V.A. Hospital in Topeka since that time. General supervision of Dr. Puerta consisted of semi-weekly meetings with Dr. Marsh. Furthermore, Dr. Marsh was generally available for any assistance required by Dr. Puerta. Dr. William Simpson, Chief of Psychiatry Service, supervised Dr. Marsh during this same period. Dr. Simpson met weekly with residents in psychiatry to see if their educational needs were being met.

28. After Jerry Bent's admission to the V.A. Hospital on August 29, 1974, a treatment plan was prepared by the treatment team of Ward 4–2C. The treatment team of any ward consisted of the physicians, nurses, and social workers on that ward.

29. The treatment plan for Jerry Bent listed three areas of concern under the following topic headings: (1) Nervous, tense, depressed; (2) Job difficulties; (3) Family problems. Under the topic "Family Problems," the following was written:

S. I am married, have a girl 15, boy 13 & girl 4. My libido has affected since I have been on medication.

O. Family still supports him—i.e.—no separation.

A. Inadequate data base.

P. Social work [with] family.

The letter S,O,A and P are diagnostic abbreviations for the following words: S-Subjective, O-Objective, A-Assessment, P-Plan.

30. Thereafter, John Birtell, the social worker assigned to Ward 4–2C, ordered Gano to do a social history on Jerry Bent.

31. On September 10, Gano telephoned Mrs. Bent at Fort Leonard Wood, Missouri, and inquired as to when she would be coming to Topeka. At that time, he informed her that he was a social work associate.

32. In the middle of September, Mrs. Bent came to Topeka to find housing for the family. During this trip, she met with Gano and they discussed some of the family's problems. Gano essentially focused on the sexual problems of Mr. and Mrs. Bent. The following day Mrs. Bent again met with Gano. Again the conversation centered on the sexual problems of the Bents. Gano suggested that the sexual problems were the basis of many of the family's other difficulties.

33. On September 19, 1974, the following note was entered in Jerry Bent's medical records by Gano:

A social worker met with wife and in her opinion her husband is a poor father image, very poor husband image, incompetent to handle money responsibility. This was based on her past observations of her husband in each of the above capacities. Also wife suggests there is a need of sexual counseling along with the other treatment her husband is receiving (apparently his attitude of amounts of sexual intercourse is once a year). His wife was very cooperative and is moving to Topeka so that she will be closer to her husband. Her only request was "we keep him till he can function as a fairly norman human being."

34. Mrs. Bent returned to Fort Leonard Wood after the meetings with Gano. While at Fort Leonard Wood, Mrs. Bent received a phone call from Gano. Gano informed her that he would no longer be working on the Bent file. John Birtell later called Mrs. Bent and told her that he would be the social worker on Jerry Bent's case.

35. On September 26, 1974, John Birtell entered the following note in Jerry Bent's medical records:

O—Social Worker talked with Mr. Bent and with Mrs. Bent over the phone. Both agree to marital counselling.

A—Both seemed very willing to work on problems.

P—Plan to set up appointment when Mrs. Bent moves to Topeka in a couple of weeks.

36. On October 3, 1974, Dr. Puerta recommended on a "Team Referral Worksheet" that Jerry Bent receive individual and marital therapy.

37. Connie, Paul and Lisa Bent moved to Topeka on October 3, 1974.

38. On October 9, 1974, Jerry Bent was examined by Dr. Voth, Senior Consultant of the Menninger School of Psychiatry. Dr. Voth diagnosed Bent as suffering from depression. Dr. Voth suggested certain changes in Bent's medication and further recommended individual psychotherapy for Jerry Bent and "family (marital) counseling."

39. After arriving in Topeka, Mrs. Bent began weekly meetings with Gano which continued throughout the month of Octo-

ber. These meetings occurred at the V.A. Hospital. During these meetings, Gano used various psuedo-treatment methods to establish trust between himself and Mrs. Bent and to break down barriers and inhibitions.

40. On October 16, 1974, Mr. and Mrs. Bent met with John Birtell and Dr. Puerta. They met two or three times in October and discussed the problems within the Bent family. The purpose of these meetings was to assess and study the family situation in an effort to prepare for Jerry Bent's release. Dr. Puerta described these meetings as "getting a picture of what was going on." It was after several meetings that the Bents expressed their dislike of Mr. Birtell and indicated a desire to have Gano work on the case. From that point onward, Gano and Dr. Puerta met with Mr. and Mrs. Bent.

41. During one of the early individual meetings in October, Gano began touching Mrs. Bent and indicated that this was necessary to establish trust in their relationship. The focus of their discussions continued to be the Bents' sexual problems.

42. On or about October 18, during one of Mrs. Bent's weekly sessions with Gano at the hospital, Gano asked Mrs. Bent to undress and put on a hospital robe. Gano proceeded to massage her shoulders and hands. Gano indicated to her that the massage was necessary for relaxation purposes.

43. Approximately a week later, Gano and Mrs. Bent had sexual intercourse at the Bent home. Gano described this act to Mrs. Bent as sex therapy.

44. From October 21, 1974, to November 11, 1974, Jerry Bent was placed in a neurological ward at the hospital for a complete neurological examination. During this period, psychiatric care for Jerry Bent was discontinued.

45. During the last part of October, Cynthia Bent moved to Topeka from Fort Leonard Wood to join her family. At that time, Mrs. Bent informed Cynthia that Gano was working with their family to help them with their problems.

46. On or about November 8, Joel Reed became Gano's supervisor. Vance Mellen, Gano's previous supervisor, was transferred to another building at the hospital. During the course of his supervision, Mellen was not aware of any incidents which indicated poor judgment by Gano in his work. Mellen received no negative reports on him from anyone. In his transfer performance evaluation, Mellen called Gano a "very remarkable man." Mellen concluded his report as follows:

> His warmth and creativity, his strong sense of responsibility and personal integrity, plus his sensitivity and concern for others have already been felt at this agency.
>
> The strength he brings plus his capacity for growth make his future with this agency or any other, exciting to project and I look forward to the possibilities of working with him in the future.

47. In early November, Mrs. Bent and Cynthia went to see Gano. Gano talked to Cynthia alone and told her that he was going to help her family with their problems.

48. Individual weekly meetings between Cynthia and Gano continued during the month of November. During these meetings in November, Gano informed Cynthia that she had certain sexual problems. He further told her that a massage would be helpful to increase her trust in him.

49. Cynthia discussed the idea of a massage with her mother. Mrs. Bent told Cynthia to take the massage and to trust Gano.

50. During the weekly sessions that followed in November, Gano told Cynthia to disrobe and during each session he massaged various parts of her body. This culminated in Gano having sexual intercourse with Cynthia at the V.A. Hospital in late November. Cynthia was a virgin prior to this experience. Gano told Cynthia not to discuss this occurrence with her mother or anyone else.

51. On November 18, Joel Reed met with Gano in his usual weekly meeting. After this meeting, Reed wrote in his notebook that Gano was following the Bent case with Dr. Puerta. Neither during this meeting nor during any of their other weekly meetings did Gano inform Reed of his activities with Connie and Cynthia Bent. In addition, neither Connie nor Cynthia Bent ever informed him of these incidents.

52. During the months of November and December, the meetings of Gano and Dr. Puerta with Mr. and Mrs. Bent continued. There were approximately eight of these meetings. Dr. Puerta was aware that Gano was meeting individually with Mrs. Bent and Cynthia. Dr. Puerta believed that these sessions were to gather information in order to assess the family situation.

53. In December, Gano's meetings with Cynthia and Mrs. Bent increased. Each of them began seeing Gano twice a week. The meetings generally occurred between 3:30 and 4:00 p.m. during the week. Shift changes at the hospital occurred at approximately the same time.

54. It was during the month of December that Gano told Cynthia that he loved her and wanted to marry her. He also repeatedly called her at home. On one occasion, after he took her to a movie, Gano took her to the V.A. Hospital where they again had sexual intercourse. In all, they had intercourse on three occasions at the V.A. Hospital.

55. On December 6, the following note, written by John Birtell, appears in the medical records:

Ted Gano, S.W.A. and Dr. Puerta have been working with Mr. and Mrs. Bent together to work on their marital problems.

56. In early December, Dr. Puerta discussed Jerry Bent's case with Dr. Clayton, a staff psychiatrist at the V.A. Hospital. Dr. Clayton then began individual psychotherapy with Jerry Bent.

57. On December 23, Gano suggested to Mrs. Bent that marijuana would be helpful in her treatment and in Cynthia's treatment. On that day, while at the V.A. Hospital, Mrs. Bent allowed Gano to give Cynthia a brownie which contained marijuana. In addition, Connie Bent, upon the advice of Gano, purchased some marijuana from him and later attempted to smoke it.

58. On December 26, Gano prepared a transfer summary on Jerry Bent. This summary contained various observations on Jerry Bent's work, family and his life. The report concluded with the following recommendation:

This worker and his colleague have agreed to see the patient and his wife and this worker has agreed to see the children until such a time the patient can be discharged and evaluated by the military for reassignment. We agree to give support to the patient's strengths. One of which is helping him set up the volunteer work project where he will donate his skills as a Dentist to an agency where he is in need. We have also allowed for the patient, his wife, and children to regress in their future and we are prepared for it if it happens. We recommend that the patient continue in psychoanalysis until he feels the need to stop.

Neither John Birtell nor Joel Reed were aware of this summary until Gano submitted copies to them in February.

59. In January, Gano began seeing Cynthia three times a week. Gano increased the sessions with Mrs. Bent to every day. During the individual meetings in January, Gano attempted hypnotism on Mrs. Bent.

60. On January 6, 1975, John Birtell became Gano's supervisor, replacing Joel Reed. It was Reed's belief that he had closely supervised Gano during his period of supervision over him. Reed had become aware of two incidents of what he termed "poor judgment" by Gano during this period. In each instance, the matter was promptly discussed with Gano and corrected.

61. On January 7, 1975, Birtell indicated in his notebook that Gano was following the Bent case with Dr. Puerta.

62. Jerry Bent was discharged from the V.A. Hospital to out-patient care on January 9, 1975. The weekly meetings of the Bents with Dr. Puerta and Gano continued after Jerry Bent's discharge.

63. Dr. Puerta entered various thoughts concerning Jerry Bent's discharge in his medical record on January 9, 1975. These notes indicated that Jerry Bent believed that he had made some progress during his treatment at the V.A. Hospital. Dr. Puerta felt that Jerry Bent was "doing well." He noted: "Through the work [illegible] [with] the Social Work Service, the conditions at home seem to be more apt to have Dr. Bent back there." Dr. Puerta indicated in his plan for Jerry Bent that there would be a family follow-up through the social work service.

64. On or about January 9, 1975, John Birtell entered the following "Closing Summary" in Jerry Bent's medical file:

Mr. Bent was admitted to this hospital on 8/29/74. He was discharged OPT–SC on 1/9/75.

Mr. and Mrs. Bent were seen in marital counseling by Dr. Puerta and Mr. Ted Gano, Social Work Associate. Mr. Bent made a great deal of progress during hospitalization and has planned to return home and to work at Topeka State Hospital in the dentistry department.

The plans at the time of discharge were for Dr. Puerta and Mr. Gano to do the follow up counseling.

Birtell received no complaints about Gano during his period of supervision. He received excellent feedback regarding the quality of Gano's work.

65. On January 25 and 26, Gano took Cynthia to Wichita for a weekend trip. Gano had told Mrs. Bent that the trip was a Kansas State University field trip to a commune in Wichita. He explained to Mrs. Bent that the purpose of the trip was to allow Cynthia to observe how others lived. Gano told Mrs. Bent that Cynthia was living in a "fantasyland" and needed to see reality. In fact, Gano was taking Cynthia to Wichita for his own pleasure. Mr. and Mrs. Bent consented to Cynthia's trip with Gano. While Gano and Cynthia were in Wichita, they had sexual intercourse on several occasions.

66. Before the trip, Connie Bent discovered a letter at the Bents' home written by Cynthia to a friend. In the letter, Cynthia expressed her love and affection for Gano. After discovery of the letter, Mrs. Bent telephoned Gano to discuss the letter. Gano told Mrs. Bent to bring the letter to the V.A. Hospital. At the hospital, Gano told Mrs. Bent that the letter indicated the degree of Cynthia's sickness. He took the letter and kept it.

67. While Cynthia and Gano were in Wichita, Mr. and Mrs. Bent discussed the letter. Jerry Bent then went to Dr. Puerta and told him about the trip and the letter. Dr. Puerta told the Bents to wait until they returned and then he would confront Gano.

68. On January 29, Gano extensively discussed the Bent case with John Birtell. At that time, Birtell learned for the first time of Gano's individual meetings with Cynthia and Connie Bent.

69. John Birtell and Dr. Puerta met with Gano on January 31, 1975. It was only prior to this meeting that Birtell learned of the trip to Wichita.

70. On February 3, Birtell met with Joel Reed to discuss the Bent case.

71. On February 4, the following memo, signed by Jerry Bent, Connie Lou Bent, and Theodore Gano, was sent to Joel Reed and John Birtell:

SUBJECT: Trip to Wichita, Kansas Saturday 25th and Sunday 26th of January 1975

The purpose was to allow Cynthia Bent, a minor, to observe some reality aspects of the American society, i.e. extreme poverty, social interaction of low class American citizens, and family group living situations.

This trip was approved and discussed by the parents of Cynthia Bent.

The trip to Wichita, Kansas is not directly or indirectly associated with the Topeka Veterans Hospital or any agents employed there acting on behalf of hospital

business or in any official working capacity.

I, Theodore Gano, was off duty and acting as a private citizen absolutely under no jurisdiction of the Topeka Veterans Hospital.

I, Dr. Jerry Bent, DDS, and I, Connie Lou Bent, gave our permission for our daughter Cynthia to attend the trip to Wichita, Kansas on Saturday, the 25th and Sunday, the 26th of January, 1975. Furthermore, I, Dr. Jerry Bent and I, Connie Bent, have no legal charges pending against the Topeka Veterans Hospital or any agent employed there as a result of this trip to Wichita. Also, I, Dr. Jerry Bent and I, Connie Bent, will never bring any legal or civil charges against the Topeka Veterans Hospital or any agent employed there as a result of our daughter's trip to Wichita, Kansas Saturday the 25th and Sunday the 26th of January 1975. This trip was completely void of any Topeka Veterans Hospital business or any agent employed there acting on behalf of the hospital. It is considered a private matter, and we are completely satisfied with the outcome of the trip.

72. On February 6, Dr. Clayton entered his psychotherapy notes in Jerry Bent's medical file. These notes state, in pertinent part:

Jerry began individual psychotherapy Dec. 11, 1974. He was admitted to the hospital 8–29–1974.

\* \* \* \* \* \*

His wife, her two children 15 [female] and 14 [male] and their daughter 4 yrs. are now living in Topeka. He has been placed on outpatient status. He is in marital and family therapy [with] Dr. Puerta and Mr. Ted Gano on the 4–2–C ward.

73. Gano submitted his letter of resignation to his superiors at the hospital on February 10, 1975.

74. On the following day, Jerry Bent sent a letter to Dr. M.B. Ardis, Director of the V.A. Hospital, praising Gano. The letter stated:

This is a letter of commendation for Mr. Theodore Gano, Social Worker V.A. Hospital, who through his deep devotion to his professin (sic) and his astute insight and perception has greatly assisted myself, my wife, my oldest daughter, and my son.

Without his excellent guidance and counseling our family unit would not have progressed so well and so rapidly as it has. He has the greatest talent and outstanding ability to communicate with people on their lay-level of knowledge and assist them in solving their problems.

I strongly recommend that this gentleman be further considered for future post-graduate training as he is a definite asset to his profession and to the mental health of society.

75. On February 13, Cynthia "ranaway" with Gano to Kansas City. Cynthia was later discovered and returned home.

76. Gano admits that his sexual activity with both Connie and Cynthia Bent were for his own sexual gratification and had nothing to do with his work assignment at the V.A. Hospital. Gano actively concealed the fact of his individual meetings with Cynthia and Connie Bent from his supervisors from the very beginning of the meetings.

77. On June 11, 1975, Jerry Bent left his home in Topeka without notice and went to Texas.

78. Upon arriving in Texas, Jerry Bent scheduled an appointment with Dr. Nicholaus Giannukos, a psychiatrist in Houston. Jerry Bent met regularly with Dr. Giannukos for treatment from June 23, 1975 to July 15, 1977.

79. In December 1975, Jerry and Connie Bent were divorced.

80. Gano was found guilty by a jury in the United States District Court, Topeka, Kansas, on February 20, 1976, on three counts of having sexual intercourse with a

**1338**

minor, Cynthia Bent, in violation of 18 U.S.C. § 2032.

81. On February 13, 1977, Jerry Bent was admitted to St. Francis Hospital in Topeka, because of depression and drug and alcohol problems. He was later transferred to the Menninger Clinic for detoxification purposes.

82. On February 24, 1977, Jerry Bent attempted suicide. The suicide attempt was unsuccessful.

83. On July 25, 1977, Jerry Bent was found dead in Houston, Texas. The medical examiners in Houston ruled Jerry Bent's death a suicide. Jerry Bent left several notes. A note directed to his mother stated:

I just can not fight any longer and looking at filthy mouths.

I love you very much and we will meet in the Great Beyond hopefully.

Another note directed to "Boogie" stated in pertinent part:

I am tired of fighting life—it is too much for me. I can't stand it any more.

Prior to the suicide, Jerry Bent had abused drugs and had been quite concerned over the prospects of bankruptcy.

84. Cynthia Bent suffered injury as a result of her contacts with Theodore Gano at the V.A. Hospital. She is susceptible to future emotional problems as a result of her experiences.

85. Connie Bent suffered injury as a result of her contacts with Theodore Gano at the V.A. Hospital. However, the effects of her experience had virtually diminished by the time of the trial.

86. Jerry Bent suffered some injury as a result of his family's contacts with Theodore Gano at the V.A. Hospital.

## CONCLUSIONS OF LAW

■ It is well settled that the United States, as sovereign, is immune from suit except as it consents to be sued and that the terms of its consent to be sued in any court define the court's jurisdiction to entertain the action. *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed.

1058 (1941). The United States has consented to be sued for torts in the Federal Torts Claims Act, 28 U.S.C. § 1346(b). The parties have stipulated that the Federal Tort Claims Act governs the instant action. Its applicable provision reads in pertinent part:

The district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Thus, the statute directs us to look at the law of the state where the act or omission occurred in order to determine whether a complaint in negligence warrants relief. *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Sanchez v. United States*, 506 F.2d 702 (10th Cir. 1974). In this case, Kansas law provides the appropriate standards.

## SCOPE OF EMPLOYMENT

■ The court shall first examine whether Theodore Gano was acting within the scope of employment during the events in question at the V.A. Hospital. It is well established that state law is controlling in determining the question of whether a federal employee is acting within the scope of his employment for the purposes of the Federal Tort Claims Act. *Williams v. United States*, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955); *Pattno v. United States*, 311 F.2d 604 (10th Cir.1962), *cert. denied*, 373 U.S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963).

As stated previously, it is defendant's position that the court lacks jurisdiction pursuant to 28 U.S.C. § 1346(b) for any claims arising from Gano's sexual acts with Connie and Cynthia Bent, including body massages, sexual intercourse, and the con-

versations leading up to the massages and intercourse, because these acts were beyond the scope of his employment and for his own sexual gratification. However, plaintiffs contend that Gano committed numerous acts of negligence and malpractice, many of which were separate and independent from the sexual acts, which were incidental to his employment as a social work associate and thus within the scope of his employment. The court shall examine the law in Kansas on this issue and then consider whether or which of Gano's actions were outside the scope of his employment.

A review of Kansas law reveals that a determination of whether an employee is acting within the scope of his employment involves a consideration of the individual factual setting of each case including objective as well as subjective considerations. Further, the Kansas Supreme Court has long recognized that it is an issue that is at times not easily determined. *Mansfield v. William J. Burns Int'l Detective Agency,* 102 Kan. 687, 691, 171 P. 625 (1918); *Kemp v. Chicago, Rock Island & Pacific Ry. Co.,* 91 Kan. 477, 481, 138 P. 621 (1914). The most recent cases in Kansas discussing the issue of scope of employment are *Williams v. Community Drive-In Theater, Inc.,* 214 Kan. 359, 520 P.2d 1296 (1974) and *Hollinger v. J.C. Stormont Hospital and Training School,* 2 Kan.App.2d 302, 578 P.2d 1121 (1978).

In *Williams*, plaintiff was shot by an employee of a drive-in theater while on the premises of the theater. Plaintiff brought an action against the theater and the employee alleging that the employee, while acting within the scope of her employment, negligently discharged a shotgun and caused his bodily injury. The defendant employee claimed that she accidentally shot plaintiff in the back because she thought he might be ready to cause some trouble at the drive-in. The district court rendered summary judgment for the theater. On appeal, the Kansas Supreme Court reversed and remanded the case for a jury to determine whether the employee was acting within the scope of her employment at the time plaintiff was injured. The Court

stated the general rule regarding scope of employment as follows (quoting from PIK 7.04):

> An employee is acting within the scope of his authority when he is performing services for which he has been employed, or when he is doing anything which is reasonably incidental to his employment. The test is not necessarily whether the specific conduct was expressly authorized or forbidden by the employer, but whether such conduct should have been fairly foreseen from the nature of the employment and the duties relating to it.

214 Kan. at 364, 520 P.2d 1296.

The Court, after reviewing several older Kansas cases, then stated:

> [I]f an assault by an employee is motivated entirely by personal reasons such as malice or spite or by a desire to accomplish some unlawful purpose and does not have for its purpose the furtherance of the employer's business, it will be considered personal to the employee and not such as will make the employer answerable. If the assault is committed by the employee while furthering the employer's interest in some way the employer is liable under the doctrine of *respondent superior* —Let the master answer. *Thus we see the relation of the act to the employer's business becomes an important criterion in determining the employer's liability.* (emphasis supplied)

*Id.* at 366, 520 P.2d 1296.

Finally, the Court's analysis of the facts in the case provides further direction:

> In the case at bar the trial court in reaching its decision apparently regarded the employee in question as merely a concession stand employee. We think the record indicates she was more than that. She was specifically requested to remain after the concession stand closed and assist in closing the theater. Part of those duties consisted of preventing unauthorized entry after the ticket office had closed. Despite the fact she may not later have been paid by her employer for

her services that night she was appellee's employee at the crucial time. Although she may have used poor judgment in her actions her own testimony indicates she was motivated by a desire to further theater interests rather than personal reasons such as malice or spite. She was shepherding two apparent intruders to the assistant manager for investigation when the shotgun discharged. There was evidence that the fact she had the gun on the premises was known to that individual, who himself carried a gun. The facts presented indicate certain employment at the drive-in was of a nature where the display and use of guns was contemplated in the furtherance of the employer's business in preserving order.[3]

*Id.* at 367–68, 520 P.2d 1296.

In *Hollinger*, plaintiff was injured while selling and delivering newspapers to patients and employees in the defendant hospital. Plaintiff was in the lobby of the hospital with a bag of newspapers when an employee of the hospital, defendant's janitor, approached plaintiff from behind and attempted to remove a newspaper from the bag. In the process, the employee lifted or jerked the bag in such a manner that plaintiff was injured. The district court rendered summary judgment in favor of the defendant upon plaintiff's theory of *respondeat superior*. The Kansas Court of Appeals affirmed and rejected plaintiff's argument that the employee was acting within the scope of his employment because many of defendant's employees bought and read newspapers while on the job. The Court stated:

Plaintiff's injuries were not caused by the act of purchasing or reading a newspaper but occurred when Rome attempted to pull a newspaper out of the bag

plaintiff was carrying. Rome states that, although he did not intend to hurt plaintiff, he was teasing her and attempting to have a little fun with her that day. The act which resulted in plaintiff's injuries was Rome's prank and had little or nothing to do with the purchase or reading of a newspaper.

2 Kan.App.2d at 311, 578 P.2d 1121.

The Court summarized the test as formulated in *Williams* as follows:

The test is not necessarily whether the conduct was expressly authorized or forbidden by the employer, but whether such conduct should have been fairly foreseen from the nature of the employment and the duties relating to it. The liability of an employer for the acts of his employee depends not upon whether the injurious act of the employee was willful and intentional or was unintentional, but upon whether the employee, when he did the wrong, was acting in the prosecution of the employer's business and within the scope of his authority or had stepped aside from that business and had done an individual wrong. The now generally recognized rule is that the employer is liable for the reckless, willful, intentional, wanton, or malicious acts of his employee as well as for his heedless and careless acts if they are committed while the employee is acting in the execution of his authority and within the course of his employment, or with a view to the furtherance of his employer's business, and not for a purpose personal to the employee.

*Id.*

This court finds that several factors can be deduced from the *Williams* and *Hollinger* decisions as well as other older Kansas authority.[4] First, the key consideration

---

**3.** This court notes that upon remand the jury found that the defendant employee was not acting within the scope of her employment. *See Williams v. Community Drive-In Theater, Inc.,* 3 Kan.App.2d 352, 595 P.2d 724 (1979).

**4.** We have examined the following Kansas cases in addition to *Williams* and *Hollinger* on the scope of employment issue: *Hynes v. Jungren,* 8 Kan. 391 (1871); *Hudson v. M.K. & T. Ry. Co.,*

16 Kan. 470 (1876); *Wheeler & Wilson Mfg. Co. v. Boyce,* 36 Kan. 350, 13 P. 609 (1887); *O'Banion v. Missouri Pacific Ry. Co.,* 65 Kan. 352, 69 P. 353 (1902); *Crelly v. Missouri & Kansas Telephone Co.,* 84 Kan. 19, 113 P. 386 (1911); *Lehnen v. E.J. Hines & Co.,* 88 Kan. 58, 127 P. 612 (1912); *Roberts v. Kinley,* 89 Kan. 885, 132 P. 1180 (1913); *Kemp v. Chicago, Rock Island & Pacific Ry. Co., supra; Mansfield v. William J.*

for the trier of fact in determining whether an employee is acting within the scope of his employment is the purpose of the employee's act rather than the method of performance. Thus, if the wrongful act is done for a purpose personal to employee and not in the furtherance of the employer's business, the employer is not liable. This calls for consideration of the objective circumstances of the incident as well as the subjective thoughts of the agent at the time.

 Second, an examination of whether the employee has express or implied authority to do the acts in question must be made. However, in certain situations, an employer may be liable for the acts of the employee, even if such acts are done in excess of the authority conferred. *See, e.g., Mansfield v. William J. Burns Int'l Detective Agency, supra.* It is of course recognized that an agent may well have implied authority to do something without necessarily having express authority to do it. However, authority, whether express or implied, is to be exercised in the usual and ordinary way; and authority to do an act is not implied from authority to do another act, unless the acts are so related to each other, or the circumstances are such, as to justify the inference that authority extended to doing the act in question.

 Third, the determination of whether an employee's acts are incidental to his employment involves a consideration of whether the employee's acts were reasonably foreseeable by the employer. Finally, the time at which the agent commits the alleged wrongful act is not accorded great weight but is a factor to be considered. These general considerations or factors are similar to those recognized by other courts, although they may vary in some degree. This is evidenced by summaries included in

the following authorities. In 53 Am.Jur.2d, Master and Servant § 427 at p. 444, it is stated:

Among the many factors to be taken into consideration may be mentioned the employer's ownership of the instrumentality by means of which the employee inflicted the injury and the fact that it was furnished to the employee by the employer, although the mere entrusting of an instrumentality to the employee by means of which he commits a tort is not of itself, unless the instrumentality is one classed as a dangerous instrumentality, sufficient to establish vicarious liability. Other factors to be considered are the time at which the wrongful act was done—whether at a time when the employee was not obligated to perform any duty for the employer, in which case the latter is not ordinarily to be held responsible—the place at which the wrongful act was done and the purpose of the act, the personal motive of the employee, whether the act is one commonly or usually done by employees engaged in similar capacities, and whether the employer had reason to expect that an act of the character complained of would be committed by the employee.

In Jayson, *Handling Federal Tort Claims* § 216.01 n. 9, the following factors are listed as relevant in determining whether an employee's act is within the scope of his employment (citing *Restatement of Agency* § 229 and *Prosser on Torts,* p. 460 (4th ed. 1971)):

[W]hether or not the act is one commonly done by such servant; the time, place and purpose of the act; the previous relations between the master and servant; the extent to which the business of the master is apportioned between different servants; whether or not the act is outside the enterprise of the master, or if

*Burns Int'l Detective Agency, supra; Brown v. Union Pacific Railroad Co.,* 111 Kan. 338, 207 P. 196 (1922); *Kyle v. Postal Telegraph Co.,* 118 Kan. 300, 235 P. 116 (1925); *Wilson v. Fowler Packing Co.,* 123 Kan. 470, 255 P. 1109 (1927); *Kastrup v. Yellow Cab & Baggage Co.,* 129 Kan. 398, 282 P. 742 (1929); *Kiser v. Skelly Oil Co.,*

136 Kan. 812, 18 P.2d 181 (1933); *Ruff v. Farley Machine Works Co.,* 151 Kan. 349, 99 P.2d 789 (1940); *Willett v. McCormick,* 161 Kan. 658, 170 P.2d 821 (1946); *Hamilton v. Neff,* 189 Kan. 637, 371 P.2d 157 (1962); *Beggerly v. Walker,* 194 Kan. 61, 397 P.2d 395 (1964).

within the enterprise, whether or not it has been entrusted to any servant; whether or not the master has reason to expect that such an act will be done; the similarity in quality of the act done to the act authorized; whether or not the instrumentality by which the harm was done was furnished by the master to the servant; the extent of departure from the normal method of accomplishing an authorized result; and whether or not the act is seriously criminal.

■ After listening to the testimony in this case, reviewing the depositions of Theodore Gano and considering the aforementioned Kansas cases on the issue of scope of employment, we are convinced that Gano was acting outside the scope of his employment in his contacts with Connie and Cynthia Bent on an individual basis. It is clear that Gano was not expressly authorized to act in the manner that he did in his relationship with the Bent women. Furthermore, the court fails to find that Gano had any implied authority to act as he did. Gano was hired as a social work associate. As such, his duties were extremely limited. They consisted essentially of menial and task-oriented jobs. He was not qualified to engage in any type of therapy or counseling nor was he instructed or trained to do so. Although Gano was allowed to meet individually with family members of patients, the purpose of such meetings was to gather information to aid the social workers. The court does not find it foreseeable that Gano would engage in the conduct he pursued here based upon the limited nature of his position at the hospital. Thus, an examination of the objective circumstances of Gano's employment at the V.A. Hospital leads the court to believe that he was acting outside the scope of his employment during his relationship with Connie and Cynthia Bent.

This finding is further supported by Gano's own deposition testimony. The court has already noted in this order the problems that exist in the testimony of Gano. In this instance, the court believes that Gano's deposition of February 14, 1979, provides the key information in determining the scope of employment issue:

Q. Were you told by Dr. Puerta or your supervisor to work with Mrs. Bents?

A. I was told by John Birtell that I would be working with the Bent family, yes.

Q. And what did he describe as your work with them to be?

A. I was to assist Dr. Puerta in working with Mrs. Bent and Mr. Bent and I was to do a social intake. I don't recall him saying that about Cindy Bent, just that I was to assist in doing the normal social work associate duties in the Bent case.

Q. And what at that time did you understand those normal duties to be?

A. I understood them to be the assistance of Dr. Puerta and I shared in those meetings what took place between Mrs. Bent and myself on the individual meetings and I explained these to John Birtell, therefore I assumed that they was expected.

Q. Did you at any time in your meetings with any of the Bent family exceed these duties?

A. Very definitely.

Q. As for your work with Cindy Bent, how much or up to what time in your contact with her were you fulfilling the duties required of you by John Birtell?

A. The very initial times that I was meeting with her, I don't recall exactly how many, when I was doing a social in-take and discussing with her her position in the family and her background were the duties that were not necessarily described by John Birtell but expected of me as a social work associate.

Q. And after what visit, if we could break it down that way, did you cease to act within those duties?

MR. SCHROER: Now in whole or in part? You haven't allowed in the response.

Q. In whole or in part, in whole or in part.

A. I don't recall the exact meeting it was, whether it was the third or fourth or exactly what meeting it was, but my personal need gratification took precedence over any social work that I was doing and I was conducting myself for my own personal needs rather than on a social work level.

Q. In all of your contacts then with Cindy Bent after the completion of the social work history?

A. It was for my own personal gratification.

The above testimony indicates that Gano was not acting in the furtherance of legitimate social work service business but for purposes personal to him. By his own admission, Gano's acts, including the body massage and the conversations advocating sex acts, were for his own personal gratification and beyond his work assignment. The conduct arose from some external, independent and personal motive on the part of Gano. He was not motivated by any consideration for the Veterans Administration. Rather, he had completely abandoned the disciplined program of a social work associate and instead had embarked upon a wholly undisciplined course of conduct that could not further the purposes of social work service but could only frustrate them. Theodore Gano had simply stepped aside from his delegated duties to serve his own purpose. This purpose, his own sexual gratification, was totally unrelated to the duties of his employment.

Of course, plaintiffs have argued that numerous acts of malpractice were committed here by Gano and others at the V.A. Hospital separate from Gano's sexual contacts with Connie and Cynthia Bent. In an earlier response to defendant's motion for summary judgment, plaintiffs articulated the following independent acts of negligence and malpractice committed by the defendant:

[T]he record shows that the Veterans Administration failed to provide an adequate treatment plan for the Bent family; that the treatment plan of the Veterans Administration was carried out by unqualified personnel; that the counseling done by Theodore Gano (apart from sexual contact) was below social work standards. That it was improper social work to tell Cynthia Bent that her mother was ill; that it was improper social work conduct to tell Connie Bent that her daughter was ill; that it was improper social work conduct to tell Cynthia and Connie Bent not to talk to each other; that Dr. German Puerta was unqualified to do marital therapy and yet did the same; that Theodore Gano was unqualified to do family therapy; that it was improper to suggest to the Bents that they use marijuana as a treatment; that it was improper to suggest to massages; that there was a mishandling and therefore negligence in regard to the transference phenomenon by Theodore Gano. That it was malpractice for Theodore Gano to indicate to Cynthia Bent that religion was not important; that it was improper for Theodore Gano to suggest that sexual relations were necessary for treatment.

The court finds that, with the exception of the first contention, all of the acts stated by the plaintiffs were acts undertaken by Gano to further his desire to have sexual relations with Connie and Cynthia Bent. After Gano obtained the initial information from Mrs. Bent, in their first meetings, it seems apparent that he then stepped aside from his position as a social work associate and pursued his own personal needs. He was not motivated by any desire to further Veterans Administration interests, he was simply motivated by his own personal wants and desires.

During closing argument, plaintiffs also contended that defendant should be liable for the acts of Gano based upon the doctrine of apparent authority. Plaintiffs relied upon the discussion contained in 53 Am.Jur.2d, Master and Servant § 429. Therein, it is stated:

Both reason and authority confirm that if the circumstances were such that the

master must be regarded as having held the servant out as authorized to render services or perform acts or work of a particular character, either for the plaintiff or the public generally, he may be held liable, on a doctrine substantially that of apparent authority, for injuries or damages sustained through a reliance on the appearance of authority so existing. The cases which have involved the point fairly show that if a servant issues a direction or order which falls within the apparent scope of his authority in doing the work of his master, the latter may ordinarily be held liable for injuries proximately resulting to one who acts on the direction or order, and this notwithstanding that it was given contrary to instructions or without actual authority. And if, by reason of the position in which he is placed by his master, a servant is clothed with an apparent authority to invite or permit persons to go to or enter a particular place, the master will be liable for the acts of the servant in pursuance of that appearance of authority to the same extent that he would be had he himself issued the invitation or permission. *But it appears beyond argument that in respect of a servant's malicious or wanton acts the master cannot be held liable on the ground of a merely apparent authority, since the injured person does not suffer by reason of having placed reliance on any appearance of authority.* (emphasis supplied)

We find the instant case to be one in which the employee engaged in malicious and wanton acts which the V.A. Hospital cannot be held liable on the ground of apparent authority. Thus, we conclude that Gano was acting outside the scope of his express, implied and apparent authority during his involvement with Connie and Cynthia Bent. Accordingly, the court lacks jurisdiction under 28 U.S.C. § 1346(b) for plaintiffs' claims of wrongful conduct by Gano in his relationship with Connie and Cynthia Bent.

In reaching this conclusion, the court finds it unnecessary to consider the defendant's additional arguments regarding the battery and misrepresentation exceptions to the Federal Tort Claims Act. However, the court will consider plaintiffs' additional claims against the defendant. In order, the court shall consider the following: (1) Was the V.A. Hospital negligent in the hiring, training or retaining of Theodore Gano? (2) Was the V.A. Hospital negligent in supervising Gano? (3) Was the V.A. Hospital negligent in the hiring, training, retaining or supervising of Dr. Puerta? (4) Were the occurrences at the V.A. Hospital in 1974 and 1975 the proximate cause of Jerry Bent's death in 1977?

*Was the V.A. Hospital negligent in the hiring, training or retaining of Theodore Gano?*

Kansas law recognizes that an employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit. *Stricklin v. Parsons Stockyard Co.*, 192 Kan. 360, 388 P.2d 824 (1964); *Murray v. Modoc State Bank*, 181 Kan. 642, 313 P.2d 304 (1957); *Balin v. Lysle Rishel Post No. 68*, 177 Kan. 520, 280 P.2d 623 (1955); *Hollinger v. Jane C. Stormont Hospital, supra.* Such negligence consists of hiring or retaining the employee when the employer knew or should have known of the incompetence or unfitness of the employee. *Id.* It is, of course, necessary to establish such negligence as the proximate cause of the damage to the third person, and this requires that the third person must have been injured by some negligent or other wrongful act of the employee so hired. *Hollinger v. Jane C. Stormont Hospital, supra.* Also see *Restatement (Second) of Agency* § 213.

The aforementioned Kansas cases do not contain any significant analysis of the standards to be employed in applying this theory of recovery. In fact, there has been little analysis of the negligent hiring and retention theory. *But see* Note, *The Responsibility of Employers for the Actions of Their Employees: The Negligent Hiring Theory of Liability*, 53 Chi.-Kent L.Rev. 717 (1976); Comment, *Negligent*

*Hiring and Negligent Entrustment: The Case Against Exclusion,* 52 Or.L.Rev. 296 (1973); Note, *Employer's Duty to Know Deficiencies of Employees,* 16 Clev.-Mar.L. Rev. 143 (1967). The following instruction, given by the trial court in *Hollinger* and approved on appeal, provides some guidance on the standards applicable to this claim:

### INSTRUCTION NO. 3

An employer may be negligent when it has reason to know that an employee, because of his qualities, is likely to harm others. If the dangerous quality of the agent causes harm, the principal may be liable under the rule that one initiating conduct having an undue tendency to cause harm is liable therefor. The dangerous quality in the agent may consist of his incompetence or carelessness.

Such an employer is not liable merely because the employee is incompetent or careless. If liability results, it is because, under the circumstances, the employer has not taken the care which a reasonable and prudent man would take in selecting or retaining the employee for the work at hand. What precautions must be taken depend upon the situation. One can normally assume that another who offers to perform simple work is competent.

Liability results under this rule not because of the employer-employee relationship of the parties, but only if the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm. However, it is not necessary that the precise nature of the injury alleged by plaintiff should have been foreseen by the defendant.

2 Kan.App.2d at 305–306, 578 P.2d 1121.

The court shall first consider whether the V.A. Hospital was negligent in hiring Gano. As noted in *Hollinger,* an employer's duty is to use reasonable care in hiring employees. *Also see Evans v. Morsell,* 284 Md. 160, 395 A.2d 480 (1978); *Fleming v. Bronfin,* 80 A.2d 915 (D.C.Mun.App.1951). The law regarding this duty of care is summarized in Note, *The Responsibility of Employers for the Actions of their Employees: The Negligent Hiring Theory of Liability, supra,* as follows:

[The employer's duty] has been interpreted to require the employer to conduct some kind of a minimal investigation of an applicant's background prior to hiring. In *Weiss v. Furniture in the Raw* [62 Misc.2d 283, 306 N.Y.S.2d 253 (N.Y.City Ct.1969)], the defendant hired an employee to make a delivery to the plaintiff without conducting any investigation or inquiries into the employee's background and failed even to obtain the employee's address. The court held the failure to use any standards in hiring was a breach of the duty owed.

The duty has never been held to require an in-depth investigation of an employee's background. In *Stevens v. Lankard* [31 App.Div.2d 602, 297 N.Y.S.2d 686 (1969), *aff'd,* 25 N.Y.2d 640, 254 N.E.2d 339, 306 N.Y.S.2d 257 (1969)], the defendant hired a store clerk who had been previously convicted of sodomy. The employee subsequently committed an act of sodomy on a thirteen year old customer. The court held that the duty had not been breached because a routine investigation would not have revealed the sodomy conviction and to require employers to conduct a more extensive investigation would place an unfair burden on the business community.

The standard of care required is always that of a reasonable person but the amount of care can vary. In *C.K. Security Systems, Inc. v. Hartford Accident & Indemnity Co.* [137 Ga.App. 159, 223 S.E.2d 453 (1976)], the defendant was employed to provide guards for the plaintiff's premises. The guards stole blank checks from the plaintiff and later

forged and cashed them. The court held that the amount of care required was of a very high degree because of the possibility of injury inherent with the job.

For the duty to be breached there must be a connection between the information available and the type of harm suffered by the plaintiff. In *Argonne Apartment House Co. v. Garrison* [42 F.2d 605 (D.C.Cir.1930) ], a landlord hired an employee to work in the plaintiff's apartment. The employee, who had been previously convicted for being intoxicated, stole jewelry from the plaintiff's apartment. The court held that the conviction for being under the influence of alcohol did not indicate that the employee was unfit for this employment and consequently there was no breach of the duty owed.

If the information which would make the employee unfit for employment would not be uncovered in a routine background check, there is no breach. In *Stone v. Hurst Lumber Co.* [15 Utah 2d 49, 386 P.2d 910 (1963) ], the court held that the defendant could not have discovered in a background investigation the vicious tendencies of an employee which caused him to attack the plaintiff because there was no record of these tendencies. Therefore, there was no breach of duty. (footnotes omitted)

53 Chi.-Kent L.Rev. at 726–727.

In the instant case, plaintiffs contend that the defendant was negligent in hiring Gano in the following particulars:

That Gano did not make written application for the job; that he had two oral interviews which lasted only ten to fifteen minutes each; that he was not given a mental examination; that he was not tested for competency or psychological factors; that no pre-employment investigation was made of his qualifications and background; and that he was not thoroughly interviewed as to determine character defects.

After a review of the aforementioned authorities, we find no merit to these contentions for several reasons. An examination of the position of social work associate at the V.A. Hospital reveals that it was generally regarded as a job that involved only clerical and task-oriented duties. The educational requirements consisted of a bachelor's degree in major fields of study such as social welfare, sociology or psychology. The position required no experience. Considering the duties required of a social work associate, we find these requirements to be reasonable. Gano easily met these requirements. In addition, he had prior work experience in the area.

Furthermore, we fail to find that the V.A. Hospital breached its duty of care in the actual hiring of Gano. Prior to being hired, Gano was interviewed for over two hours concerning the position of social work associate. These interviews coupled with his obvious qualifications were sufficient to justify his hiring for the task-oriented position of social work associate. The hospital relied upon a background check performed by the Civil Service Commission. Plaintiffs have not contended nor proven that the background check performed by the Civil Service Commission was inadequate or improperly conducted. We find the combination of the interviews and the background check sufficient to satisfy the hospital's duty to investigate Gano's background considering the nature of the position he sought.

In addition, we find no merit to plaintiffs' contention that the V.A. Hospital was negligent in failing to require that Gano submit to a mental examination or be tested for competency or psychological factors. Plaintiffs have failed to provide any authority for such a proposition and we have discovered none. We believe that such a requirement for a position such as social work associate would be unreasonable. This would impose a significant burden upon the V.A. Hospital which the job does not warrant. In sum, we find no negligence by the defendant in its hiring of Theodore Gano.

Of course, the duty of the employer does not end once the employee is hired.

As held in *Stricklin, Murray* and *Hollinger,* the employer also has a duty to retain only safe and competent help. The law regarding negligent retention of an employee is summarized at 57 C.J.S., Master and Servant § 559, p. 271, as follows:

> *Retaining in employment* a servant who is, or should be, known to be incompetent, habitually negligent, or otherwise unfit, is such negligence on the part of the master as will render him liable for injuries to third persons resulting from the acts of the incompetent servant, whether the master's knowledge of the servant's incompetency was actual, or direct, or constructive, the master is chargeable with knowledge of the incompetency of the servant if by the exercise of due or reasonable care or diligence he could have ascertained such incompetence.

Thus, the critical standard here is whether the employer knew or should have known that the individual was potentially dangerous. There was little evidence presented by the plaintiffs to indicate that the V.A. Hospital was negligent in retaining Gano. With the exception of his involvement with Connie and Cynthia Bent, Gano was an extremely competent employee. He received high evaluations from his superiors from the outset of his employment. His supervisors testified that they received no negative feedback on his performance. Joel Reed, Gano's second supervisor, testified that there were two occasions in which he felt that Gano exhibited poor judgment. These incidents were not deemed significant and were attributed to Gano's lack of experience and "his desire to be a helping person." Upon notice of these incidents, Reed immediately discussed them with Gano and instructed him as to the appropriate behavior for each situation. We simply believe there was little here to provide the requisite notice that Gano was an incompetent or unfit employee. It was unforeseeable under these circumstances that Gano would engage in the sort of conduct he did with Connie and Cynthia Bent. In sum, plaintiffs failed to establish that the defendant knew or should have known that Gano was an incompetent or unfit employee.

The court now moves on to a consideration of whether the defendant negligently trained Theodore Gano. The court has found virtually no case law on this particular theory nor have the parties cited the court to any. The cause of action is referred to in § 213 of the *Restatement (Second) of Agency.* In addition, 57 C.J.S., Master and Servant § 560, contains the following:

> Negligence of the master in failing properly to instruct his servants as to the method of performance of the work which they are employed to do renders him liable for injuries to third person resulting therefrom, as does his failure to see that his instructions are obeyed.

Although this court has failed to discover a Kansas case on this particular theory, it does appear to have received some support in other jurisdictions. Despite the lack of guidance on the cause of action, we believe that general negligence concepts would apply. Depending upon the particular job in question, it seems incumbent upon the employer to provide a reasonable amount of training to an employee so as to allow him to carry out his duties without endangering either himself, fellow employees or third persons. In the instant case, we find that the defendant did not act negligently in training Theodore Gano for the position of social work associate.

Upon employment, Gano went through an orientation program of two to three weeks to acquaint himself with his duties and the hospital. He then started a one hundred hour training program which was required of all social work associates. This program provided an orientation to the field of social work. Thereafter, he completed a specialized training course called "tiger training" which was designed to improve the functioning of various disciplines within the hospital. In addition to the structured training programs, Gano received extensive on-the-job training from his supervisors during his employment.

This degree of training, without question, satisfied the duty imposed upon the V.A. Hospital to adequately train Gano as a social work associate.

*Did the V.A. Hospital negligently supervise Theodore Gano?*

■ Once again, the court has failed to discover a case in Kansas recognizing a claim against an employer for failing to adequately supervise an employee. However, as with plaintiffs' claim of negligent training, such a theory of relief is recognized in Section 213 of the *Restatement (Second) of Agency*. The theory is also recognized in *International Distributing Corp. v. American Dist. Telegraph Co.*, 569 F.2d 136, 139 (D.C.Cir.1977). *Also see Melton v. United States*, 488 F.Supp. 1066, 1074 (D.D.C.1980). Once again, as with any claim of negligence, it is incumbent upon the plaintiffs to demonstrate that the V.A. Hospital failed to exercise ordinary care in their supervision of Theodore Gano, measured by all the circumstances then existing.

During the course of his employment at the V.A. Hospital, Gano had three supervisors: Vance Mellen, Joel Reed and John Birtell. Each testified that close supervision was important for a beginning social work associate. Each testified that they considered their supervision of Gano to have been very good. This supervision consisted of weekly meetings, daily contacts, and other training sessions.

The problems occurred in the instant case because of Gano's concealment of his extensive involvement with Connie and Cynthia Bent. A review of Gano's deposition testimony reveals that he went to great lengths to conceal his involvement with the Bent women from his supervisors. In addition, Gano's supervisors had no independent sources indicating that any improprieties had occurred. Connie and Cynthia Bent never informed Gano's supervisors of the nature of his contacts with them. It appears that only Dr. Puerta knew that Gano had several individual meetings with the Bent women. However, he failed to inform John Birtell of this fact because he

believed that Birtell was aware of it. Furthermore, Dr. Puerta was entirely unaware of the nature of the meetings.

The plaintiffs presented various evidence which they contended demonstrated the lack of supervision exercised over Gano at the hospital. Plaintiffs emphasized that Joel Reed knew of two incidents in which Gano exercised poor judgment prior to his contact with the Bent family. The court has examined this contention in the claim of negligent retention of Gano by the V.A. Hospital. The court feels that nothing further needs to be added except that Reed stated that after these incidents were taken care of, he continued close supervision of Gano.

Plaintiffs also presented evidence on the meetings between Mr. and Mrs. Bent and Dr. Puerta and Gano. The court surmises that this evidence was offered for two purposes: first, to demonstrate the lack of supervision exercised over Dr. Puerta; and second, as an indication of the lack of supervision exercised over Gano. The court shall consider the first purpose later in this opinion. Plaintiffs have argued that it was negligent of the defendant to allow both an unqualified social worker and an unqualified psychiatrist to provide marital counseling and therapy to the Bents. This might well be the case if in fact Gano and Dr. Puerta did provide marital counseling and therapy to the Bents and some damage did arise from it. However, these particular facts were not demonstrated by a preponderance of the evidence. While portions of the medical records do indicate that marital counseling and therapy for the Bents was contemplated, it is not clear that it was ever begun. John Birtell and Dr. Clayton did note in Jerry Bent's medical records that Dr. Puerta and Gano were conducting marital counseling and therapy with the Bents. However, Dr. Puerta, the only one with the requisite knowledge to know in fact what occurred during those meetings, denied that counseling and therapy took place. Rather, he stated that the meetings were primarily for the purposes of gathering information and studying the family

situation. We do not find that marital therapy and counseling, as it was defined during the course of the trial, was being conducted during those meetings.

Plaintiffs also presented evidence on alleged negligent record keeping by the V.A. Hospital on the Bent case. This contention is tied to the claim based on negligent supervision. It is argued that if the record keeping of the Social Work Services Department had not been negligent, then Gano's involvement with the Bent family would have been discovered. We do not find that to be the case. The inadequacy of the records on the Bent family can be attributed to two factors. First, Gano's meetings with Connie and Cynthia Bent were not documented because of his efforts to conceal his surreptitious activities. Obviously, Gano was not going to reveal the nature of his meetings in the medical records for fear of discovery by his supervisors. Second, and perhaps more importantly, the records regarding Connie and Cynthia Bent are not as numerous as those regarding Jerry Bent because Connie and Cynthia were not patients of the hospital. Jerry Bent was the patient here. His family was seen in connection with his admittance to the hospital as an effort to pave the way for his release. No one at the hospital regarded the entire family as patients. However, they were, of course, connected and involved in the treatment of Jerry Bent. We do not find the records here to have been negligently kept nor do we find them to be persuasive evidence of the lack of supervision over Gano.

In sum, the court finds the supervision of Gano, under the circumstances of this case, to indeed be reasonable and not negligent.

The court shall now consider the plaintiffs' claims concerning Dr. Puerta. Plaintiffs allege that the V.A. Hospital was negligent in the hiring, retaining, training and supervising of Dr. Puerta. Before examining those claims, the court finds it necessary to first consider defendant's argument that plaintiffs have failed to exhaust administrative remedies as required by 28 U.S.C. § 2675(a) on the claims concerning Dr. Puerta.

▇ 28 U.S.C. § 2675(a) provides in pertinent part:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

The purpose of the administrative claim requirement is to ease congestion of the courts and avoid unnecessary litigation, to afford the government an opportunity to investigate and expedite the fair administrative settlement of tort claims. *Simpson v. United States*, 484 F.Supp. 387, 396 (W.D.Pa.1980). The administrative claim procedure is *not* intended to make recovery from the government technically more difficult. *Executive Jet Aviation, Inc. v. United States*, 507 F.2d 508, 516 n. 4 (6th Cir.1974) and the cases cited therein.

In the instant case, each plaintiff filed an administrative claim which detailed the events involved in this litigation. The facts focused essentially on the conduct of Theodore Gano. However, Dr. Puerta was mentioned in the description of the accident and he was also mentioned under the heading of "Persons and Parties." On the other hand, the defendant is correct that the specific allegations made against Dr. Puerta in the amended complaint were not contained in the plaintiffs' administrative claim.

We believe that the decision reached by the court in *Dillon v. United States*, 480 F.Supp. 862 (D.S.D.1979), is informative here. There, the court rejected an argument similar to the one made by the government here. In *Dillon*, plaintiff brought suit under the Federal Tort Claims Act to recover for allegedly improper medical treatment at an Indian Health Services

hospital. The court held that plaintiff's administrative claim which alleged improper treatment and medical services during the course of an operation at the hospital was sufficient to allow plaintiff to sue on a theory of lack of informed consent. The court stated:

.Defendant contends, in very conclusory language, that although it was put on notice as to the rest of plaintiff's allegations by her administrative claim, the portions of her complaint involving lack of informed consent present "a new and different claim". This position cannot be sustained. Taken literally, plaintiff's administrative claim, was only for "improper treatment and medical services *during the course of the gall bladder operation*". (Emphasis supplied) Yet, defendant does not seek to dismiss the portions of the complaint involving allegations of improper diagnosis and examination, actions which must have mainly taken place prior to the operation. Presumably, defendant was not deprived of the opportunity to investigate these phases of plaintiff's treatment, even though she did not make explicit mention of them in her claim.

The implementing regulation here, 28 C.F.R. § 14.2(a), states that "a claim shall be deemed to have been presented when a Federal agency receives ... written notification of an *incident....*" (Emphasis supplied) The regulation does not say that every detail of the incident must be supplied, only that the agency be notified that an accident has occurred.

480 F.Supp. at 863.

■ The claims submitted by the plaintiffs here did provide the defendant with sufficient information to enable the agency to conduct a full investigation of the incident stated by the plaintiffs. Dr. Puerta's participation in these events, although extremely limited, was part and parcel of the incident stated by the plaintiffs in their administrative claims. Accordingly, we find no merit to defendant's argument and shall consider plaintiffs' claim regarding Dr. Puerta.

*Did the V.A. Hospital negligently hire, retain, train or supervise Dr. German Puerta?*

The court has already detailed the law on these various theories and finds no reason to provide any additional discussion. We find these claims to be without merit for several reasons. First, and foremost, there was no evidence presented that any damage resulted from Dr. Puerta's involvement with the Bent family. During closing argument, the following colloquy occurred:

THE COURT: Let me ask you right there, what harm do you find came to anyone from the meeting of the four? I mean, what damage do we have in evidence that flows from the meeting of the four?

MR. SCHROER: Just from that I don't think we have any specific damage that we can separate from the meeting of the four. What I am trying to say is—what I am trying to say is that at the same time there was individual therapy going on and Dr. Puerta knew, and Ted Gano knew it, and Mr. Birtell knew it and Dr. Marsh knew it. You see, this really goes to our theory of lack of supervision. The fact that what individual damage came from the meeting of the four we are not trying to separate out. We are saying that goes to the case of lack of supervision.

Thus, it was admitted by the plaintiffs that they sought no damages from the meetings with Dr. Puerta but only intended to use them to demonstrate the lack of supervision at the hospital. The court has previously addressed this contention in its discussion of plaintiffs' claim of negligent supervision of Gano.

Second, we do not find that the defendant failed to properly hire, train and supervise Dr. Puerta. The findings of fact reveal considerable evidence on each of these claims that demonstrate no negligence by the defendant concerning the employment of Dr. Puerta.

■ It was clear from the evidence presented in this action that the damages

inflicted upon the Bent family arose entirely from Theodore Gano's involvement with the family. Dr. Puerta was not significantly involved in the actual events which caused the damage to the Bent family. Accordingly, all claims arising out of Dr. Puerta's participation in this case are found to be without merit.

In light of the aforementioned conclusions reached by the court, we find it unnecessary to consider the issues of whether the Kansas comparative negligence statute applies to this case and whether the defendant is entitled to a set-off for the payment of benefits previously awarded to the plaintiffs. We also find it unnecessary to consider the following motions: (1) defendant's motion to amend pretrial order; and (2) defendant's motion to strike.

We now move to plaintiffs' final claim. *Were the events that occurred at the V.A. Hospital in 1974 and 1975 the proximate cause of Jerry Bent's death?*

 Assuming, arguendo, negligence or malpractice was present in the V.A. Hospital's handling of the Bent case, it cannot be found that such was the proximate cause of Jerry Bent's death. Proximate cause is a prerequisite for a finding of liability due to negligence under Kansas law. *Cooper v. Eberly*, 211 Kan. 657, 508 P.2d 943 (1973); *Elliott v. Chicago, Rock Island & Pacific Railroad Co.*, 203 Kan. 273, 454 P.2d 124 (1969). Proximate cause is defined as that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. *Wilcheck v. Doonan Truck & Equipment, Inc.*, 220 Kan. 230, 552 P.2d 938 (1976). Speaking of proximate cause in *Elliott,* the court stated:

> Natural and probable consequences are those which human foresight can anticipate because they happen so frequently they may be expected to recur. It has also been said that it must appear the injury was anticipated or that it reasonably should have been foreseen by the

person sought to be charged with liability.

203 Kan. at 284, 454 P.2d 124.

There is authority, as recognized by the defendant, for the proposition that suicide is an abnormal efficient intervening unforeseeable cause that will bar a recovery by the plaintiff in a tort case. *See, e.g., Scheffer v. Railroad Co.*, 105 U.S. (15 Otto) 249, 26 L.Ed. 1070 (1882); *Salsedo v. Palmer*, 278 F. 92 (2d Cir.1921); *Lancaster v. Montesi*, 216 Tenn. 50, 390 S.W.2d 217 (1965). An exception to this rule arises when the conduct of the tort-feasor causes a mental condition which results in an uncontrollable impulse leading to suicide. *See, e.g., Jamison v. Stover Broadcasting Co.*, 511 F.Supp. 1286 (E.D.Mich.1981); *Hamilton v. Chaffin*, 506 F.2d 904 (5th Cir.1975); *Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal. Rptr. 28 (1960). *Also see generally,* Annot., Civil Liability for Death by Suicide, 11 A.L.R.2d 751.

 We fail to find, even under the latter view, that Jerry Bent's suicide was proximately caused by the events that occurred at the V.A. Hospital in 1974 and 1975. Dr. Bent's suicide occurred some two years after the events at the V.A. Hospital. During that period, several events occurred in Jerry Bent's life, *i.e.,* his divorce, his bankruptcy, another attempted suicide, job problems, that could have contributed or been his sole reason for his decision to commit suicide. All of these events coupled with extremely unstable life prior to his admittance to the V.A. Hospital make it very difficult for this court to find that the events at the V.A. Hospital proximately caused Jerry Bent's death. There was certainly no indication in the suicide notes left by Jerry Bent that the events at the V.A. Hospital played any part in his decision to commit suicide. Where the purported injury and the eventual suicide are so far removed in time and circumstance as here, causation must simply be found to be lacking. The words of the court in *Jamison v. Stover Broadcasting Co., supra,* are applicable here:

While one may arguably attempt to spin a web connecting all the events in Mr. Jamison's life after his discharge to the effect the discharge had on him, the connecting strands are too thin to support a legal claim. Explanations for our personality traits and idiosyncrasies are often laid to different life experiences we have had. But the fact that a person's life experiences have an indelible effect on future developments cannot be independently sufficient to carry the requirement of legal causation. In the instant case, for example, the experiences contributing to Mr. Jamison's decision to end his life clearly were multiple; only by speculation can they be tied directly to the discharge. More probably, his life was complicated by the discharge and, as things "snowballed," life became increasingly unbearable. Of course, plaintiff would contend that if the discharge were at the core of the snowball then the causal requirement is met. This reading of causation is untenable, however, because, as I have suggested, the interconnection between life experiences is virtually infinite; to permit liability to attach merely because one event triggered other experiences which combined to create an unbearable circumstance for Mr. Jamison would be to expand the concept of causation beyond manageable bounds.

511 F.Supp. at 1292–93.

In sum, we fail to find that the events at the V.A. Hospital in 1974 and 1975 proximately caused Jerry Bent's death.

In reaching the above results, the court wants to make it clear that it is not unmindful or unsympathetic to the plaintiffs' plight and suffering. However, to hold the United States government legally responsible under these circumstances for the despicable conduct of its employee would not only be contrary to the decisional law of Kansas, but would also expand the waiver of sovereign immunity beyond that contemplated by Congress. This court has the sworn duty to look at the facts and make its judgment based upon the evidence and testimony elicited at the trial. The plaintiffs, the defendant, and the public must expect no more and no less from the court than that cases be decided without fear, favor, sympathy, prejudice or bias.

Looking back, it is rather easy to have 20/20 hindsight and it is easy now to say that something different should have been done than was done in all of this sequence of events. But the court must view conditions as they existed at the time and try to see whether there was such want of attention to the nature or probable consequence of any act or omission, as a reasonably prudent man ordinarily bestows in acting in his concerns of like importance. This test focuses on the activities of the Veterans Administration staff to see whether they failed to give requisite attention to the nature of probable consequences of what they did or didn't do. As established in the body of this opinion, we do not find any negligence in the hiring, retaining, training or supervising of Theodore Gano or Dr. German Puerta. And to the extent that plaintiffs' claims are based upon Gano's improper conduct with Connie and Cynthia Bent, we find that such conduct was outside the scope of his employment.

This decision shall be deemed to constitute findings of fact and conclusions of law for this action.

IT IS THEREFORE ORDERED that the clerk of the court enter judgment herein in favor of defendant and against the plaintiffs.

IT IS SO ORDERED.