No. 47,168

Jerry Williams, *Appellant,* v. Community Drive-in Theater, Inc., *Appellee,* and Donna Kinder McKenna, (Defendant).

(520 P. 2d 1296)

Opinion filed April 6, 1974.

*John A. Bausch*, of Ascough, Bausch, and Eschmann, of Topeka, argued the cause and was on the brief for the appellant.

*Robert D. Ochs*, of Fisher and Benfer, Chartered, of Topeka, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an action against a corporate drive-in theater and one of its employees for damages for personal injuries sustained by a theater patron as a result of the employee's discharge of a shotgun. Summary judgment was rendered for the theater company and the patron has appealed.

Plaintiff Jerry Williams in his petition alleged that on April 7, 1970, he was a patron on the theater premises in Topeka operated by defendant Community Drive-In Theater, Inc.; that defendant Donna Kinder McKenna was at that time a theater employee and was acting within the scope of her employment; at the time in question Donna negligently and carelessly discharged a shotgun into his back, inflicting bodily injuries and consequent damages for which he seeks recovery. Jury trial was demanded.

Defendant Community filed its separate answer denying, among other things, plaintiff's allegation that Donna was its employee at the time in question and that she was acting within the scope of her employment.

After the taking of certain dispositions Community filed its motion for summary judgment on the ground the pleadings and depositions showed there was no genuine issue as to any material fact and it was entitled to judgment as a matter of law.

At the time the motion was heard and judgment rendered the trial court had before it the depositions of plaintiff, Donna and Community's manager as well as the latter's affidavit. We briefly summarize the matter contained in those documents.

Plaintiff testified that on the night in question he and his girl friend and Tim Yates and his wife attended the movie at Community's drive-in theater. As they were driving their car toward the exit they were stopped by another vehicle which blocked their path; the man in the other car asked plaintiff what he was doing driving around; plaintiff replied he wasn't driving around, he was just trying to leave the theater; the man said "Okay, go ahead"; they

were angry about being stopped and after taking the girls home he and Yates decided to go back and file a complaint with the manager; they wanted an apology or something; they drove back to the drive-in and went directly to the concession stand; the ticket office was closed; the movie was still being shown and people were at the theater; they knocked at the concession door but got no response; about that time he saw a girl open a car door and take out a gun; he walked around to the south side of the concession stand and the girl came up behind him and Yates and pointed the gun at plaintiff; he turned and asked her what she was doing; hearing nothing he turned and started to walk away; he took two or three steps and the girl shot him; before the gun went off Yates said he wanted to see the manager; the girl said "just keep walking."

Donna McKenna testified that at the time of the incident she was sixteen years of age; she was employed at the Community drive-in theater on April 7, 1970, and had been working there for about three weeks; she worked in the concession stand; sometimes she helped close the theater; closing it involved picking up speakers that might have been thrown down and closing and locking all doors and the gate; her husband worked at the theater ticket office and one time prior to April 7, 1970, she had helped him close the place; the night she helped him close they sat in the car to make sure everyone left; her husband would check cars that came in after the ticket office closed, maintain discipline and make sure there was no foul play; on April 7, 1970, she reported to the drive-in manager, Mr. Barnhardt, about 6:00 p. m., inquiring if she was scheduled to work; he replied that she was not but she might be needed later that night; she left and returned that night between 9:00 and 9:30 p. m.; she parked her automobile next to the southeast corner of the concession stand; they were quite busy there and the manager asked if she would run the cash register; about 10:30 p. m. while she was still working at the cash register, the assistant manager, Mr. Robertson, asked her if she would help him close the theater because the other girl was due home; she agreed to help him; she helped close the concession stand shortly after 11:00 p. m. and then went with Robertson in his car; at this time she, Robertson and the projectionist were the only employees on the premises; Robertson parked the car close to the entrance so they could view the movie and also see if anyone tried to get in without paying; while sitting there she saw plaintiff's car come into the drive-in and go to the con-

cession stand; Robertson said he believed this was the same car he had twice before asked to leave; Robertson drove his car down to the concession stand where the men were walking around and he then went to talk to a third man who was in plaintiff's car; she accompanied Robertson and then went to her car to get her husband's .410 gauge shotgun to take to Robertson; since there were three men against Robertson she thought the shotgun would give him a little more authority and the three would think twice before causing any trouble; she was afraid for his and her safety because the man in the automobile made her believe they were in for trouble; she was walking behind the plaintiff and his friend when they stopped and one of them said, "She has a gun"; she then put the gun up against plaintiff's shoulder and told him, "Let's go to the other side of the building"; plaintiff turned as if to walk in front of her, the gun dropped, she grasped the gun tighter which probably pulled the trigger and plaintiff was shot; she grasped the gun tighter only to keep it from falling when plaintiff unexpectedly turned; she had no intention of shooting him or anyone else; the gun discharged accidentally.

Donna further testified she checked the shotgun to see if it was loaded but had not checked the safety; the decision to get the gun was her own; her husband had been at the theater earlier that day using the gun to shoot rats and "things"; he would engage in this practice frequently with Robertson and the manager; Robertson knew they owned a shotgun; she had fired the shotgun that afternoon but had not previously done so; she did not receive any pay for the evening.

The manager, Mr. Barnhardt, testified as to the duties of various drive-in employees; the assistant manager, Robertson, was in charge that night after he had left; Robertson was expected to investigate any disturbance, maintain discipline among patrons, watch and protect property and take appropriate action; on the night in question he noticed an automobile drive to the rear about 10:45 p. m.; he and Robertson started to investigate; Robertson asked if he could help them: when they said they were trying to find their way out Robertson showed them and they left. Barnhardt testified he left before the shotgun incident and had no contact with plaintiff other than observing the automobile; he talked with Robertson after the incident; Robertson told him the man in the back of the car said the other two were looking for the "guy" who had stopped

them earlier; Robertson said he was going to call the police but heard the shot before he could do so; there would be nothing unusual about one employee protecting another and any employee would be expected to take reasonable measures to protect property; employees were supposed to report disturbances; they had instructions to make no resistance in event of a robbery.

The manager's affidavit revealed the following: Sometime prior to the shotgun incident he had been hiring deputy sheriffs at $3.00 per hour to act as security guards; the parent corporation of which Community was a subsidiary decided this was too much expense and theater personnel would have to do the security and police work themselves and maintain order within the theater area without the deputy sheriffs; he had a deputy sheriff's commission; Robertson obtained a deputy sheriff's commission and a deputy sheriff's shirt to use on occasions when deemed necessary; Robertson also obtained a permit to carry a gun and carried one at times while on duty; security was needed on week-ends and when they had large crowds; fights occurred, people threw beer cans and they caught deserters; it was a pretty rough place and on those occasions he and Robertson would try to break up disturbances with the use of force; on several occasions they called in police; Leon Barker, a doorman, carried a gun and once "put a gun to a guy's head for throwing gravel"; another doorman helped in some difficulties; the incidents mentioned occurred prior to the night in question; he was sure Robertson knew Donna had the shotgun in her car as everyone knew that her husband had the shotgun. The manager had never told Donna to leave the gun at home.

The trial court, in a memorandum opinion, reviewed certain items of evidence and applicable law and concluded Donna was not acting within the scope of her employment when she discharged the shotgun into plaintiff's back. It stated there was no indication the assistant manager asked for her assistance or for her to get help or that he appeared to be in danger other than in Donna's perception of events as they occurred and under the evidence there was no imaginable way the conduct of the sixteen year old girl, an employee of just three weeks in the concession stand, could have been foreseen from the nature of her duties and employment. The court rendered judgment summarily dismissing the action as to Community.

Rules governing propriety of summary judgments should first

be noted. A motion for summary judgment under the provisions of K. S. A. 60-256 (c) is to be sustained only where the record conclusively shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In considering such a motion the movant's adversary is entitled to the benefit of all reasonable inferences and doubts that may be drawn from the facts under consideration. Where the facts presented in the motion are subject to conflicting interpretations or reasonable persons might differ as to their significance summary judgment is improper. It is only when it can be said that reasonable persons could reach but one conclusion from the same evidence that an issue may be decided as one of law. Summary judgment should never be granted merely because the court may believe movant will prevail if the action is tried on the merits.

Plaintiff-appellant contends the evidence before the court disclosed Donna was acting in the course of her employment or at the least it sufficiently presented a factual issue as to her status to be determined by a jury. He emphasizes his action is based on negligence, arguing that Donna did not intend to shoot anyone but accidently discharged the shotgun while she was directing appellant and his companion to Mr. Robertson. Appellant further asserts appellee Community would be liable for the shooting even if it were intentional.

Essentially appellee would treat Donna's act of shooting as a wilful assault beyond the scope of her employment as a concession stand operator rather than a negligent act incident to her employment in helping the assistant manager in his security work. The argument is that she was acting purely as a volunteer at the time complained of.

Our basic law on scope of authority in connection with a employer's vicarious liability is expressed in summarized fashion in PIK 7.04 thus:

"An employee is acting within the scope of his authority when he is performing services for which he has been employed, or when he is doing anything which is reasonably incidental to his employment. The test is not necessarily whether the specific conduct was expressly authorized or forbidden by the employer, but whether such conduct should have been fairly foreseen from the nature of the employment and the duties relating to it."

Appellant cites and relies on these summarizations found in 53 Am. Jur. 2d, Master and Servant:

"§ 427. *Meaning of 'scope of employment.'*

"Acts impliedly authorized, or such as are within the 'scope of the employment,' that is, wrongs for which the employer may be held accountable, are said not to be susceptible of precise or even very helpful definition by any phrase or short form of expression. In practically every case the authority from the master is to be gathered from and determined by the surrounding facts and circumstances—the character of the employment and the nature of the wrongful act—and is ordinarily a question to be determined by the jury. [p. 443]

. . . . . . . . . . . . .

". . . If the employee, being engaged about the business of the employer, adopts methods which he deems necessary, expedient, or convenient, and the methods adopted prove hurtful to others, the employer may be held liable. The purpose of the employee's act, rather than the method of performance thereof, is said to be the important consideration. . . . [pp. 444-445]

"§ 428.—*Equivalent expressions; person benefited by act.*

"Various words are, no doubt, the equivalents of 'scope of employment.' The expression, according to statements which are to be found in the reports, signifies line of duty, 'the field of action within which one is a servant' in the employer's service, course of the service, pursuit or transaction of the employer's business, doing what he has been directed to do, furtherance of the employer's interests, and protection of the employer's property." (p. 446.)

Appellee cites and relies on *Kastrup v. Yellow Cab and Baggage Co.,* 129 Kan. 398, 282 Pac. 742. There the superintendent of a taxicab company had authority to hire and fire cab drivers. This official beat up a discharged driver who had stopped payment on a check he had depoisted with the superintendent as security against loss from careless driving. In a damage action against the company this court held the superintendent did not have implied authority to administer the beating so as to make the company answerable. Appellee also relies on *Hamilton v. Neff,* 189 Kan. 637, 371 P. 2d 157, in which a manager of a salvage yard attacked a business invitee with a metal bar as the latter was leaving the yard after an altercation in the office over the price of a salvage item. The yard owner was absolved of liability on the ground the manager's authority did not include authority to commit the assault and battery complained of.

In *Kiser v. Skelly Oil Co.,* 136 Kan. 812, 18 P. 2d 181, recovery was allowed for personal injuries caused by an employee slamming a door so as to break its glass panel and cut plaintiff's hand. This language is found in the opinion:

"In *Mansfield v. Detective Agency,* 102 Kan. 687, 171 Pac. 625, where defendant was subjected to an action for damages for injuries sustained by

the unauthorized aggression of his employee, this well-settled rule of law was thus stated:

" 'A master or principal is responsible for the tortious acts of his servant or agent where such acts are incidental to and done in furtherance of the business of the master or principal, even if such acts are done willfully or in excess of the authority conferred.' (Syl. ¶ 1.)" (p. 816.)

The rule to be deduced from the authority cited appears to be that if an assault by an employee is motivated entirely by personal reasons such as malice or spite or by a desire to accomplish some unlawful purpose and does not have for its purpose the furtherance of the employer's business, it will be considered personal to the employee and not such as will make the employer answerable. If the assault is committed by the employee while furthering the employer's interest in some way the employer is liable under the doctrine of *respondent superior*—Let the master answer. Thus we see the relation of the act to the employer's business becomes an important criterion in determining the employer's liability. The rules in question appear to be well-stated in 53 Am. Jur. 2d, Master and Servant, § 438, as follows:

"According to the trend of modern authority, the liability of an employer for the acts of his employee depends not upon whether the injurious act of the employee was wilful and intentional or was unintentional, but upon whether the employee, when he did the wrong, was acting in the prosecution of the employer's business and within the scope of his authority, or had stepped aside from that business and done an individual wrong. The now generally recognized rule is that an employer is liable for the reckless, wilful, intentional, wanton, or malicious acts of his employee as well as for his heedless and careless acts if they are committed while the servant is acting in the execution of his authority and within the course of his employment, or with a view to the furtherance of his employer's business, and not for a purpose personal to the employee. . . ." (p. 456.)

PIK 7.04 appears to embody both the foregoing concepts.

In determining whether an assault by an employee is of a personal nature, and therefore unforeseeable, the question whether the employment is of such a nature that the use of force may be contemplated to protect the interests of the employer may become a pertinent factor. In *Beggerly v. Walker*, 194 Kan. 61, 397 P. 2d 395, this factor was discussed in the following:

"We recognize the general rule, followed in Kansas as well as in other jurisdictions, that a master is not liable for a tortious act committed by his servant, including an assault and battery upon a third person, unless the act be done by authority of the master, either express or implied, or unless the act be done by the servant in the course or within the scope of his employment. [Citations] Notwithstanding this rule, we believe that the facts set out

in plaintiff's petition bring the case within an exception thereto, which, in brief, may be stated thus: That where an employee's duties involve the preservation of peace and order on the master's premises, or the protection of the master's property from loss or vandalism, an inference arises that the servant is expected to use reasonable force in the performance of his duties and, consequently, the use of force falls within the scope of the servant's employment. The statement of the rule embodying the exception is well and more fully expressed in 6 Am. Jur. 2d, Assault and Battery, § 140, in the following words:

" 'An employer's vicarious responsibility for an assault committed by his employee may arise on the ground that the employment is of such a nature as to contemplate the use of force, and that, where an employee's duties involve the preservation of peace and order on the premises of the employer, or the protection of the employee's property from theft or vandalism, an inference arises that force, to a reasonable extent, may or is expected to be used in the fulfilment of the duties of the employment, and consequently, the use of such force is within the scope of employment. Where the nature of the employment or the duty imposed on an employee is such that the employer must contemplate the use of force by the employee as a natural or legitimate sequence, the employer will be held liable for the wilful or malicious act of his employee even though he had no knowledge that the act was to be done and although the act was in disobedience of express order or instructions given by him. Generally, where the employment contemplates some use of force, niceties of distinction are not indulged in to determine whether the use of excessive force was motivated by personal reasons, the view generally taken being that the amount of force to be used is discretionary with the employee, and even though there has been an abuse of such discretion the employer is nevertheless vicariously liable under the doctrine of respondeat superior. This is particularly true where assaults or batteries are committed by bartenders, cashiers, and managers of restaurants, managers and clerks of hotels and inns, and other similar employees who, as part of their duties, are expected to maintain order about the premises, and by store detectives.' (pp. 119, 120.)" (pp. 64-65.)

(See, also, anno. Assault by Servant, 34 ALR 2d 372 [Theaters], 424-427.)

In the case at bar the trial court in reaching its decision apparently regarded the employee in question as merely a concession stand employee. We think the record indicates she was more than that. She was specifically requested to remain after the concession stand closed and assist in closing the theater. Part of those duties consisted of preventing unauthorized entry after the ticket office had closed. Despite the fact she may not later have been paid by her employer for her services that night she was appellee's employee at the crucial time. Although she may have used poor judgment in her actions her own testimony indicates she was moti-

vated by a desire to further theater interests rather than personal reasons such as malice or spite. She was shepherding two apparent intruders to the assistant manager for investigation when the shotgun discharged. There was evidence that the fact she had the gun on the premises was known to that individual, who himself carried a gun. The facts presented indicate certain employment at the drive-in was of a nature where the display and use of guns was contemplated in the furtherance of the employer's business in preserving order. We think the facts bearing upon whether she acted within the scope of her employment were such as to raise an issue requiring jury determination. Accordingly it must be held the trial court erred in granting summary judgment. The judgment is reversed and the cause remanded with directions to proceed with trial of the action.

APPROVED BY THE COURT.