No. 120,671

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

FARMERS BANK & TRUST,
*Appellant*,

v.

HOMESTEAD COMMUNITY DEVELOPMENT, *et al*.,
*Appellees*.

SYLLABUS BY THE COURT

1.

The Cash-Basis Law provides that it shall be unlawful for the governing body of any municipality to create any indebtedness in excess of the amount of funds actually on hand in the treasury of such municipality at the time for such purpose. A municipality must keep a record of the debt and the particular fund from which payment is to be made, and any person contracting with the municipality shall be chargeable with knowledge of what such records contain. Any contract entered into between the governing body of any municipality and any person, which violates the provisions of this act, shall be void.

2.

The Budget Law provides that it shall be unlawful for the governing body of any municipality to create an indebtedness in any manner or in any fund after the total indebtedness created against such fund shall equal the total amount of the adopted budget of expenditures for such fund for that budget year. An appropriation for a municipal fund shall not be used for any other purpose. Any indebtedness incurred by the governing body or any officer of such municipality in excess of said amount set out in the budget shall be void.

3.

A party contracting with a municipality is bound at his or her peril to know the authority of the municipal body with which he or she deals. No further inquiry into the contract's validity is necessary.

4.

Contracts which a municipal corporation is not permitted legally to enter into are not subject to ratification. The fact that the other party to the contract has fully performed its part of the agreement, or has expended money in reliance of its validity, does not estop a city from asserting ultra vires, nor is a municipality estopped to aver its incapacity to make a contract because it received benefits under it. That is, a city or municipality cannot be made liable either on the theory of estoppel or implied contract where it had no capacity to make the contract or where it was made in express violation of law.

5.

A party may not begin a tort action against a municipality or an employee of a municipality without first filing written notice setting out the facts and circumstances giving rise to the claim. Failure to file the notice deprives the district court of subject matter jurisdiction over the claim.

6.

Substantial compliance with K.S.A. 2019 Supp. 12-105b(d) requirements can constitute a valid filing of a claim. Substantial compliance means providing the essential matters necessary to assure every reasonable statutory objective is met. This means that to be held in substantial compliance with the statute, the notice advises the municipality of the time and place of the injury, affords the municipality an opportunity to ascertain the character and extent of the injury sustained, and allows for the early investigation and resolution of claim disputes. The notice must provide the municipality the information needed for a full investigation and understanding of the merits of the claims.

2

7.

Failure to serve the notice on the proper official resolves a tort claim filed against a municipality. Service of notice on the county counselor or anyone else who is not the clerk or governing body of the municipality as specified in K.S.A. 2019 Supp. 12-105b(d) is not substantial compliance with the statute.

8.

Claims against municipal employees fall under the Kansas Tort Claims Act if the alleged damage by the municipality was caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment. The municipality is vicariously liable for such acts or omissions. A judgment against a governmental entity constitutes a complete bar to an action against the employee. Elected officials are included in the definition of employee.

9.

An employee is acting within the scope of his or her employment when performing services for which he or she has been employed or when doing anything which is reasonably incidental to the employment. The test is not necessarily whether the specific conduct was expressly authorized or forbidden by the employer, but whether such conduct should have been fairly foreseen from the nature of the employment and the duties relating to it.

Appeal from Geary District Court; JOHN E. SANDERS, judge. Opinion filed October 2, 2020. Affirmed.

*Steven E. Mauer* and *Christine T. Roto*, of Mauer Law Firm, PC, of Kansas City, Missouri, for appellant Farmers Bank & Trust.

*Mark S. Gunnison* and *Christopher J. Sherman*, of Payne & Jones, Chartered, of Overland Park, for appellee Terry Heldstab.

3

*Thomas V. Murray* and *Catherine P. Logan*, of Lathrop Gage LLP, of Overland Park, for appellee Junction City.

*Derrick L. Roberson* and *Matthew B. Sondergard*, of Arthur-Green, LLP, of Manhattan, for appellee Colleen Woodruff.

*David R. Cooper*, of Fisher, Patterson, Sayler & Smith, LLP, of Topeka, for appellee Charles Zimmerman.

No appearance by appellee Homestead Community Development.

Before HILL, P.J., GREEN and WARNER, JJ.

HILL, J.:  When you do business with a city in Kansas, you must be cautious. It differs from doing business with an ordinary person or company. There are many complex laws and rules that govern a city's actions that do not apply to others. A failure to understand this complexity can lead to losing what once was thought certain. This case is an example of that peril.

Farmers Bank & Trust thought it had a loan guaranty from the City of Junction City but later found it was unenforceable. Farmers also made tort claims against the City and some of its officers but disregarded a fundamental notice provision in the law. Farmers lost when the court granted summary judgment to the City and the individual officials. Because the laws and the cases that interpret them constrain what cities may do with tax expenditures and how they can be sued for redress, we hold the district court's grant of summary judgment to the City and the other defendants was proper. We affirm.

*The factual background*

In 2007, Farmers lent $600,000 to Homestead Community Development, Inc. to remodel a property called the Bartell House in downtown Junction City. Terry Heldstab, who was Mayor at the time, signed a letter of guaranty to Farmers. Colleen Woodruff, the City Clerk, attested to Heldstab's signature. And Charles Zimmerman, the City Attorney, sent a letter to Farmers stating the City had the authority under Kansas law to make the guaranty. He stated that Heldstab was authorized to sign on behalf of the City, and that the guaranty was a binding legal obligation of the City.

When Homestead failed to pay the loan, Farmers sued Homestead on its note and foreclosed its mortgage. The court granted Farmers judgment when Homestead failed to pay the loan. Farmers then turned to the City and sought to enforce the guaranty. But now, the City maintained that the guaranty was void and unenforceable. Farmers never filed a notice with the City Clerk or the City Commission of Junction City, in compliance with K.S.A. 12-105b(d), before filing its lawsuit against the City and the individual defendants.

Farmers sued the City for breach of the guaranty. It also sued the City, Heldstab, Woodruff, and Zimmerman for fraud and negligent misrepresentation. Farmers later added a claim of civil conspiracy against Heldstab, Woodruff, and Zimmerman. Farmers lost when the court denied its motion for summary judgment and granted summary judgment to all defendants. Farmers appeals.

*How we will proceed*

To efficiently deal with the issues, we will first review two laws that control all cities in Kansas—the Cash-Basis Law and the Budget Law. They are both pivotal in deciding if the court erred. The well-established rules of summary judgment are next. We

5

will then decide whether the court properly granted summary judgment to the City on the guaranty. After that, we will review the court's dismissal of all of the tort claims.

*Two laws control the outcome of the guaranty claim.*

The Cash-Basis Law and the Budget Law, enacted during the economic depression in the 1930s, have a common goal and must be construed together. See *Shouse v. Board of Cherokee City Comm'rs*, 151 Kan. 458, 462, 99 P.2d 779, *affirmed  Shouse v. Board of Cherokee City Comm'rs*, 152 Kan. 41, 102 P.2d 1043 (1940). The purpose of the Cash-Basis Law and the Budget Law is to prevent a deficit in the funds of a municipality at the end of the fiscal year. To achieve that purpose, a city's budget must be carefully made. A municipality must "keep account of all claims allowed, allocating each claim to its respective budgeted item or fund." 151 Kan. at 465. Each of the budgeted items are separate and distinct, "earmarked for a particular purpose." 151 Kan. at 464. We review the Cash-Basis Law first.

*The Cash-Basis Law*

The Cash-Basis Law provides that "it shall be unlawful . . . for the governing body of any municipality to create any indebtedness in excess of the amount of funds actually on hand in the treasury of such municipality at the time *for such purpose*." (Emphasis added.) K.S.A. 10-1112. The municipality must keep a record of the debt and the "particular fund from which payment is to be made," and "any person contracting with the municipality shall be chargeable with knowledge of what such records contain." K.S.A. 10-1117. "Any contract entered into between the governing body of any municipality and any person, which violates the provisions of this act, shall be void." K.S.A. 10-1119.

6

Shortly after its passage, our Supreme Court held that the purpose of the Cash-Basis Law was to prevent a city from spending money it did not have:

> "Broadly speaking, it is designed to have such governmental units operate their respective functions on a cash basis—not to spend money they do not have or incur obligations they cannot meet promptly. Some of them, for one reason or another, had not been doing that, but had conducted their business somewhat on a credit basis. In some, proper books had not been kept, or sufficient publicity given, so that its citizens could know its financial status. It was thought waste, extravagance and an undue burden on taxpayers resulted from such methods of doing business, and the legislature deemed it prudent to change such practices and put all such governmental units on a cash basis." *State ex rel. Boynton v. Bd. of Educ. of City of Topeka*, 137 Kan. 451, 452, 21 P.2d 295 (1933).

Thus, early on, the Supreme Court recognized that this law was to protect taxpayers.

Here, to comply with the Cash-Basis Law, the City had to have enough money in its treasury for the purpose of paying its obligation whenever it was due under the guaranty. See *State ex rel. Hecht v. City of Topeka*, 296 Kan. 505, 511-12, 293 P.3d 713 (2013). We turn now to the Budget Law.

*The Budget Law*

The Budget Law similarly provides that it

> "shall be unlawful for the governing body of any . . . municipality . . . to create an indebtedness in any manner or in any fund after the total indebtedness created against such fund shall equal the total amount of the adopted budget of expenditures for such fund for that budget year." K.S.A. 79-2935.

7

An appropriation for a fund "shall not be used for any other purpose." K.S.A. 79-2934. "Any indebtedness incurred by the governing body or any officer . . . of such . . . municipality in excess of said amount shall be void." K.S.A. 79-2935.

To comply with this law, the City needed to set out in its budget how much it anticipated to spend on the guaranty. In other words, the budget must be itemized and classified so that revenues are earmarked for a particular purpose. *Shouse*, 151 Kan. at 464. "[A]ll proposed expenditures [are] itemized and published for the scrutiny of the public, to the end that every constituent of the governing body may examine the items of anticipated expenditures." *Washington Township of Nemaha County v. Hart*, 168 Kan. 650, 654, 215 P.2d 180 (1950).

*Transactions in violation of the two laws are void.*

Our courts have enforced these laws by holding that violative agreements are unenforceable. Some people and companies have learned this lesson the hard way. When a municipality signs a contract in violation of either law, the contract has been ruled void and unenforceable and not even estoppel may save the agreement. *Hecht*, 296 Kan. 505, Syl. ¶¶ 1-3. A party contracting with a municipality is "bound at his or her peril to know the authority of the municipal body with which he or she deals." 296 Kan. 505, Syl. ¶ 4. No further inquiry into the contract's validity is necessary. See 296 Kan. at 512. In *Hecht*, a contract with the City of Topeka for the purchase of a helicopter was "void when entered into" because the City did not have $740,000 in its treasury "for the purpose of buying the helicopter." 296 Kan. at 511. In *Superior Grade School Dist. No. 110 v. Rhodes*, 147 Kan. 29, 30-31, 75 P.2d 251 (1938), the court held that the payment by the school district for building a swimming pool was unlawful and void because the budget had not specifically provided for it. Rather, the payment was drawn on a miscellaneous fund.

8

To recapitulate, these two tandem laws limit the spending of tax moneys by cities to certain established procedures. In common parlance, the first states a city cannot spend what it does not have. The second states that before a city can spend tax money, the city must first tell the taxpayers in a published budget how much and to whom it is to be paid. All transactions in violation of either law are void and unenforceable. The violation of these two laws renders the purported guaranty claimed by Farmers void.

*The rules of summary judgment govern us.*

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue on any material fact and the moving party is entitled to judgment as a matter of law. The trial court must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to dispute a material fact. To preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, this court applies the same rules, and when it finds reasonable minds could differ about conclusions drawn from the evidence, summary judgment must be denied. *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

Generally, summary judgment in a pending case should not be granted until discovery is complete. But if the facts pertinent to the material issues are not disputed, summary judgment may be appropriate even when discovery is unfinished. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). A party who requires more discovery to defend against a motion for summary judgment must seek a continuance to conduct that discovery under K.S.A. 2019 Supp. 60-256(f). See *Chesbro v. Board of Douglas County Comm'rs*, 39 Kan. App. 2d 954, 966, 186 P.3d 829 (2008).

A party cannot avoid summary judgment on the mere hope that something may develop later during discovery or at trial. Likewise, mere speculation cannot avoid summary judgment. *Kincaid v. Dess*, 48 Kan. App. 2d 640, 656, 298 P.3d 358 (2013). A party may not remain silent in the face of a motion for summary judgment and later claim there is other evidence to support its claims. *U.S.D. No. 232 v. CWD Investments*, 288 Kan. 536, 560, 205 P.3d 1245 (2009).

*How this case progressed and the holding of the court*

Farmers moved for summary judgment on its contract claim against the City to enforce the guaranty. The City followed with its own motion for summary judgment, claiming the guaranty was void. The court denied Farmers' motion for summary judgment and granted the City's motion. The court held the guaranty void under the Cash-Basis and Budget Laws because the City did not have funds "explicitly budgeted and appropriated to pay the Guaranty."

The parties disputed some facts. In its motion for summary judgment, Farmers alleged that at the end of 2007, the total amount of unreserved funds in the City's general fund was $1,811,807. The City controverted this fact. In its motion, the City asserted that it had never budgeted and appropriated funds to pay the guaranty. Farmers controverted this fact "to the extent Farmers has not had an opportunity to conduct discovery on this topic."

To us, Farmers contends that summary judgment should not have been granted on a Cash-Basis Law violation because it was a disputed fact whether the City had undesignated funds on hand in excess of the amount of the guaranty when it executed the guaranty. In other words, there was enough money in the City's coffers.

But the district court ruled that "undesignated reserve funds" did not matter. The court found that to comply with these two laws, the City had to do more than just have money in its accounts. It had to acknowledge and act on its obligation:

> "[W]hether or not the City had any unreserved balances in its general fund is immaterial since by not setting aside and reserving specific funds to pay the Guaranty the Cash Basis and Budget Laws were violated. The question of unreserved balances has no bearing on the validity of the Guaranty."

We find the court's conclusion on this point sound and supported by the caselaw cited above. The City not only needed to have enough funds available in its treasury, it needed to *designate* those funds to pay the guaranty so the funds would not be used for another purpose. The Cash-Basis Law states that a municipality cannot expend funds it does not have on hand "for such purpose." K.S.A. 10-1112. The City did not have funds on hand to pay the guaranty.

Farmers does not dispute that the Budget Law requires municipalities to budget and appropriate funds for its expenditures. Instead, Farmers contends that the two laws should be read separately—but our Supreme Court has held otherwise in *Shouse*. "The cash basis law . . . and the budget law . . . have a common basic purpose and must be construed together." 151 Kan. at 462. Thus, whether the City had undesignated funds on hand in excess of the amount of the guaranty was indeed immaterial. The district court was correct.

Farmers offered some "additional facts" later. Farmers contends, after it deposed Beatty, the City Finance Director, that it was a disputed fact whether the City did budget and appropriate funds to pay the guaranty. Thus, it was improper for the court to grant summary judgment to the City.

11

We pause here for a procedural note. This deposition was taken after the court had granted judgment to the City on the guaranty claim, but the tort claims against the City and the other defendants were still pending. The judge had granted both sides permission to continue with discovery while their motions for summary judgment on the guaranty were taken under advisement.

We find this argument puzzling because Farmers also argues the court should have admitted its "additional facts"—one of which was that the City did not budget for the $600,000 guaranty: "8. The City did not amend its budget in 2007 to reflect the Guaranty principal amount of $600,000 even though it had sufficient funds to do so." This statement supports a finding of a Budget Law violation. This added material fact does not help Farmers' case.

For its motion for summary judgment, the City relied on Beatty's affidavit where she stated the City never budgeted or appropriated any funds to pay the guaranty. This is what the trial court relied on in granting summary judgment to the City. In Beatty's affidavit, she explained how the budget was prepared, along with the forms used.

> "9.    For the years in question, the City prepared its annual budget using Budget Forms obtained from the Kansas Department of Administration.
> "10.    Debt obligations are reported in the Statement of Indebtedness and the Statement of Conditional Lease-Purchase and Certificate of Participation in the City's annual budget (collectively, 'Statements').
> "11.    The Statements list the types and amounts of the City's debt obligations and the associated interest rates, payment schedules, and amounts to be appropriated in the annual budget.
> "12.    Accordingly, the Statements provide the debt amounts for budgeting purposes and serve as notice to the public that the City has been obligated to pay the indebtedness for that budget year."

12

She then described her review of the budget.

> "13.    The alleged guaranty, if it had been budgeted and appropriated, would have been identified in the Statements for 2007 and thereafter until the debt was paid.
>
> "14.    The amounts listed in the Statements are budgeted in the Debt Service Fund, an Enterprise Fund, a Special Revenue Fund, or within the General Fund on a specific line item listed under debt, lease-purchase, or interest.
>
> "15.    I have reviewed the annual budgets adopted by the City for 2007 through 2016 and the related audits for those years.
>
> "16.    The City's annual budget for 2007 did not allocate or appropriate any funds to pay the guaranty or any amounts for the 'Restaurant Condo Indebtedness.'"

Finally, she described her review of budgets that came after that.

> "17.    Likewise, the City's annual budgets for 2008 through 2016 did not allocate or appropriate any funds to pay the guaranty or any amounts for the 'Restaurant Condo Indebtedness.'
>
> "18.    The alleged guaranty and the 'Restaurant Condo Indebtedness' have also not been listed in any of the City's audits from 2007 through 2016."

This affidavit shows the technical legal constraints on a city in Kansas. By following the procedures set out in her affidavit, the City would thus comply with the two laws.

To us, Farmers contends Beatty's affidavit is belied by her own deposition testimony. Farmers contends that Beatty did not possess the requisite knowledge or competence necessary to complete her affidavit because she had no personal knowledge and did not investigate. Simply put, Farmers contends that Beatty was ill-informed:

- She did not reach out to prior employees or prior city commissioners concerning the guaranty;

13

- she looked in the City records and minutes for references to the loan guaranty and found no record of the loan guaranty;
- she did not review the agenda memos that accompany the minutes;
- there was no file system in place prior to her becoming finance director in 2010;
- there were hundreds of boxes of records in the City Hall basement that she had not looked through, but she went through all the ones related to the time frame in question;
- she reviewed the City's budgets and comprehensive annual fiscal reports;
- the year-ending cash balance is not in the comprehensive annual fiscal reports;
- in 2009, in the records of checks issued to vendors, there were records of payments in the amount of $35,062.50 and $59,578.71 to Homestead;
- in 2014, the Economic Development Council gave a $35,000 loan to Homestead's tenant, Kites; and
- she was not involved in the investigations regarding this suit; she was merely responsible for gathering documents.

In our view, Beatty's deposition testimony falls short of evidence that she was unqualified to make her affidavit, or that the City *did* budget the funds necessary to pay the full amount of the guaranty if Farmers accelerated the loan upon Homestead's default. It is unclear what records Farmers hopes to find in the basement. These additional facts offered by Farmers do not persuade us to reverse the district court's grant of summary judgment to the City on the guaranty issue.

*The City did make some payments to Farmers.*

Farmers contends that some payments the City did make on the guaranty show that it *could* and *did* appropriate funds when needed. In 2009, the City made two

14

payments to Homestead on the guaranty to avoid default on the loan in the amounts of $59,578.71 and $35,062.50. In 2014, when the loan was in default, the City provided funds to Homestead's tenant, Kites, and Kites then paid Farmers $17,640.

When the district court considered these payments, it stated:

"While there is no dispute that such payments were made, the Court finds such circumstances not helpful to Farmers. The fact remains that the City did not establish and maintain a separate, identified reserve in the amount of $600,000, and the Court finds this is a violation of the Cash Basis Law and the Budget Law. The guaranty is void and unenforceable. Some partial payments do not make legal that which is by law illegal. Making some interim payments does not equate to establishing a dedicated reserve fund."

What is decisive here is under the guaranty, the entire debt could have been owed by the City after one missed payment by Homestead. The guaranty did not depend on the money being appropriated by the City. The guaranty was void when made and could not be ratified by payments made years later. Our Supreme Court held in *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, Syl. ¶¶ 7, 9, 181 P.3d 549 (2008), a city cannot ratify a void contract:

"Contracts which a municipal corporation is not permitted legally to enter into are not subject to ratification . . . ."

"The fact that the other party to the contract has fully performed its part of the agreement, or has expended money in reliance of its validity, does not estop a city from asserting ultra vires, nor is a municipality estopped to aver its incapacity to make a contract because it received benefits under it. That is, a city or municipality cannot be made liable either on the theory of estoppel or implied contract, where it had no capacity to make the contract or where it was made in express violation of law."

In a similar way, the City here could not, by making payments, ratify this void contract.

15

A clear example of a failed ratification is found in *Hecht*. In that case, a $74,000 deposit had been made, but the court declared the contract void and ordered the deposit refunded. 296 Kan. at 507.

Farmers also argues that the City cannot simply choose not to allocate funds to cover the guaranty to later avoid liability on the guaranty and hide behind the Budget Law. In other words, the City cannot promise to do something and then fail to take the legal steps necessary to fulfill its promise. This is not persuasive.

This court rejected a similar argument in *Unified School District No. 207 v. Northland National Bank*, 20 Kan. App. 2d 321, 887 P.2d 1138 (1994). The court said failure to comply with the law is not saved by estoppel:

> "Although it might at first appear that the school districts had the power to enter into lease-purchase agreements and simply failed to comply with the legislative conditions . . . .
>
> . . . .
>
> "[w]here a municipality fails to execute a contract in compliance with mandatory conditions prescribed by statute, estoppel does not and cannot apply. The act of entering into the lease-purchase agreements without complying with the cash-basis act was illegal. The resulting agreements are void. [Citation omitted.]" 20 Kan. App. 2d at 334.

The court found that Northland National Bank's arguments ignored the purpose of the Cash-Basis Law, which is to protect the taxpaying public, not the municipality. 20 Kan. App. 2d at 333. Similarly, Farmers' argument ignores the purpose of the two laws—to protect the taxpaying public.

Moreover, the two laws place the responsibility on any party contracting with a municipality to check the books. The municipality must keep a record of the debt and the "particular fund from which payment is to be made" and "any person contracting with the

16

municipality shall be chargeable with knowledge of what such records contain." K.S.A. 10-1117. A party contracting with a municipality is "bound at his or her peril to know the authority of the municipal body with which he or she deals." *Hecht*, 296 Kan. 505, Syl. ¶ 4. Here, Farmers, as a contracting party, was "bound at [its] peril" to check the City's budget and accounts.

We find it telling that in her affidavit Beatty stated, "In transactions with cities in Kansas, financial institutions typically ask for annual budgets and audits to verify that the municipalities have appropriated the necessary funds to make certain that such debt obligations are budgeted to be paid in accordance with the Kansas Cash-Basis Law." When you consider the effect of the Cash-Basis and Budget Laws, that is a very wise practice. We see nothing in this record that suggests Farmers asked for these verifications.

*Contingent debts are subject to the Cash-Basis and Budget Laws.*

Farmers contends that a contingent debt such as a guaranty cannot violate the Cash-Basis or Budget Laws. Farmers claims that the City can legally appropriate money on an ad hoc basis whenever Homestead misses a payment on its loan. We are not persuaded by this argument because the case Farmers cites does not support its argument.

Farmers relies on *City of Wichita v. Wyman*, 158 Kan. 709, 150 P.2d 154 (1944). The *Wyman* court noted the practical difficulties of budgeting for the city's contingent liability to pay compensation to its injured employees under its workers compensation plan, but it held the city could make "*a budget estimate* of its probable liability to pay such compensation during each ensuing fiscal year . . . for certain contingent expenses the existence and amount of which is uncertain, a rational estimate thereof . . . is all that the cash-basis and budget regulations can require." (Emphasis added.) 158 Kan. at 712. Thus, in a common-sense conclusion, the *Wyman* court held the contingent liability was

17

subject to the Cash-Basis and Budget Laws but that an estimate of expenses would comply with the law. But that ruling does not make the two laws inapplicable to contingencies.

Here, while the City's liability was unclear, the potential *total amount* of its liability was certain. Under the guaranty, the City could be liable up to $600,000—the total amount of the loan. Thus, the practical difficulties expressed in *Wyman*—estimating how much its employees would be injured during a given year—is not present here. To comply with the laws, the City needed to be prepared to expend $600,000 if Homestead defaulted on the loan. There is nothing in this record that shows the City made any budgetary allowances for this contingency.

The district court said it well:

"[T]he contingency is absolute and identifiable in an amount not to exceed $600,000 in the event of default. . . . [S]uch a circumstance creates a present indebtedness, and [is] thus subject to the cash-basis law, requiring the City of Junction City to keep a reserve on hand in the amount of the Guaranty. . . .

. . . .

"It is immaterial that the Guaranty was contingent on Homestead's defaulting on the Loan."

We hold the grant of summary judgment to the City on this point is proper. The Cash-Basis and Budget Laws prohibit the City from creating an "indebtedness" when it does not have funds on hand for that purpose. See K.S.A. 10-1112; K.S.A. 79-2935. In *Iola State Bank v. Biggs*, 233 Kan. 450, 464, 662 P.2d 563 (1983), our Supreme Court held a guaranty was "evidence of indebtedness" in the context of a different statute because the guarantor was "as liable as the principal to the Bank for all monies due the Bank not to exceed $150,000.00." The same is true here.

18

Finally, we must consider the policy that caused the creation of these two laws. If a city could guarantee any number of loans without following the Cash-Basis and Budget Laws, the purpose of those laws would be frustrated. Inevitably, a city in such circumstances would have to pay for some, if not all, of those loans. It would not have the money to do so, and the resulting debt would place an undue burden on the taxpayers. As the Supreme Court of Washington noted,

> "If a municipality could guarantee debt with no debt limit consequences, even a small town could back an almost limitless number of third-party projects by pledging its credit in the event of default. . . . Some of those guaranties would eventually come due, requiring the municipality to resort to taxes to pay for failed projects, the very evil against which our debt limits protect. . . . When a municipality makes an absolute guaranty of another entity's debt, the resulting obligation is indebtedness . . . and cannot properly be called a contingent liability. [Citations omitted.]" *In re Bond Issuance of Greater Wenatchee Regional Events Center Public Facilities Dist.*, 175 Wash. 2d 788, 801-02, 287 P.3d 567 (2012).

That is exactly what happened here. Homestead did not make its payments and Farmers accelerated the note and sought to collect the balance—over $400,000—from the City.

Thus, we hold this loan guaranty was void.

*The law on lease-purchases illustrates our holding.*

Cities, from time to time, buy equipment and other items using a method of purchase called a lease-purchase. A body of law has grown around this practice. One of the leading cases on this method is *Unified School District No. 207*, 20 Kan. App. 2d at 321. In *Unified School District No. 207*, the court held that a "lease-purchase agreement, in order to be permissible under the statute, must create no binding obligation on the municipality in future years in order to avoid the type of indebtedness prohibited by

19

K.S.A. 10-1112." 20 Kan. App. 2d at 329. The *Unified School District No. 207* decision suggests a financial agreement that binds a municipality beyond its current budget year must contain a stipulation that the municipality's obligation cannot exceed the funds budgeted and appropriated for that purpose during each budget year.

Farmers tries to distinguish *Unified School District No. 207* because, "Unlike a guaranty, the purpose of a lease purchase agreement is to finance an expenditure over time" and that "the lease-purchase agreement at issue [in that case] contained an 'acceleration clause' that allowed the entire amount to be due upon default."

But Farmers' loan agreement and guaranty do both. The City "unconditionally" guaranteed Farmers' loan to Homestead for the life of the loan—which was set to extend from 2007 to 2023. And the loan contained an acceleration clause allowing Farmers to "demand immediate payment" of the entire amount due upon a single default.

Here, the guaranty extended for the life of the loan and was unconditional. It had no stipulation that it depended on financing in future years. The balance of the loan could become due at any time during the life of the loan. Thus, the *Unified School District No. 207* analysis shows how this guaranty violates the law and is void.

Farmers contends the City can simply amend its budget to appropriate funds each time it had to make a payment on the guaranty. But that is futile. Even if the City could amend its budget to pay the guaranty in future years, the guaranty would have to contain a stipulation that it was conditioned on these future appropriations. This guaranty had no such conditions and was void on its face.

Finally, Farmers argues that the guaranty does not violate the Cash-Basis or Budget Laws because it was a business activity of the City. Farmers bases its argument on a misreading of this court's opinion in *Jayhawk Racing Properties v. City of Topeka*,

56 Kan. App. 2d 479, 432 P.3d 678 (2018). In *Jayhawk Racing*, this court held that the contract at issue did not violate the Cash-Basis or Budget Laws because the City of Topeka's financial obligations in the contract depended on the issuance of bonds—an express exception in both laws. 56 Kan. App. 2d at 502. No municipal bonds were involved in this transaction and the ruling in *Jayhawk Racing* is inapplicable here.

The grant of the City's motion for summary judgment on the guaranty by the district court was proper. We turn now to the tort claims.

*We are not persuaded that Farmers substantially complied with the statutory notice requirements.*

Among the perils of dealing with a city is the legal requirement of giving the City notice of your intent to sue by making a claim to the governing body *before* you sue. This gives the governing body the opportunity to satisfy a claim before turning the matter over to a different decision maker such as a judge or jury. The caselaw points to two aspects of this decision making: a time for the City to investigate and the opportunity to negotiate. We will review the notice law and then examine the district court's ruling on this point. After that, we offer our analysis.

The law is not complex. A party may not begin a tort action against a municipality or an employee of a municipality without first filing written notice setting out the facts and circumstances giving rise to the claim. Failure to file the notice deprives the district court of subject matter jurisdiction over the claim. K.S.A. 2019 Supp. 12-105b(d); see *Sleeth v. Sedan City Hospital*, 298 Kan. 853, 868, 317 P.3d 782 (2014).

The notice "shall be filed with the clerk or governing body of the municipality" and must contain the following:

21

"(1) The name and address of the claimant and the name and address of the claimant's attorney, if any;

"(2) a concise statement of the factual basis of the claim, including the date, time, place and circumstances of the act, omission or event complained of;

"(3) the name and address of any public officer or employee involved, if known;

"(4) a concise statement of the nature and the extent of the injury claimed to have been suffered; and

"(5) a statement of the amount of monetary damages that is being requested."
K.S.A. 2019 Supp. 12-105b(d).

No action may be commenced until after the municipality has denied the claim or 120 days have passed following the filing of the notice of the claim. K.S.A. 2019 Supp. 12-105b(d).

A 2015 amendment enacted after Farmers' claims accrued applies here. See *Nash v. Blatchford*, 56 Kan. App. 2d 592, Syl. ¶ 9, 435 P.3d 562 (2019); L. 2015, ch. 28, § 2. Before the amendment, the statute only required notice when a claim was filed against a municipality, not a municipal employee. So, the required statutory notice to the governing body of Junction City had to include notice of any claims against the individual defendants Heldstab, Woodruff, and Zimmerman.

Even so, "substantial compliance" with the statute's requirements can constitute a valid filing of a claim. K.S.A. 2019 Supp. 12-105b(d). Substantial compliance means "providing the essential matters necessary to assure every reasonable statutory objective is met." *Sleeth*, 298 Kan. 853, Syl. ¶ 2. This means that to be held in substantial compliance with the statute, the notice "advises the municipality of the time and place of the injury, affords the municipality an opportunity to ascertain the character and extent of the injury sustained, and allows for the early investigation and resolution of claim disputes." 298 Kan. at 865. The notice must provide the municipality with the information needed for a "'full investigation and understanding of the merits of the

22

claims.'" *Continental Western Ins. Co. v. Shultz*, 297 Kan. 769, 775, 304 P.3d 1239 (2013).

Substantial compliance does not depend on a mechanical counting of the information addressing each enumerated element listed in the statute. The elements are "not always equal because some have a greater impact on a municipality's ability to investigate and understand a claim depending on the circumstances." *Sleeth*, 298 Kan. at 865.

But omission of one or more elements makes the notice fatally insufficient. Plaintiffs must "attempt to supply information for each of the five categories in the statute if relevant to the facts of the case." *Dodge City Implement, Inc. v. Barber County Board of Comm'rs*, 288 Kan. 619, 641, 205 P.3d 1265 (2009).

Whether a notice substantially complied with the statutory requirements depends on an interpretation of K.S.A. 2019 Supp. 12-105b(d). And statutory interpretation is a question of law subject to de novo review. *Shultz*, 297 Kan. at 774.

When the district court addressed this issue, it held that the required statutory notice had not been given. The district court found that

> "the various back-and-forth communications and correspondence between [Farmers], the then city attorney and city manager and/or finance director concerning demands to make interim payments on the note and later discussions involving the guaranty itself and possible fraud do not amount to substantial compliance with K.S.A. 12-105b(d). Additionally, the Court finds no indication that a specific amount of monetary damages for any tort damages was ever given."

23

The court then said: "[N]othing in the series of correspondence can be read as an attempt to give notice of a municipal tort claim pursuant to K.S.A. 12-105b(d) to the city commission or city clerk."

To us, Farmers contends that it did substantially comply with the notice requirements of K.S.A. 12-105b(d) through all of the back-and-forth correspondence of the parties from March 2014 through May 2015. Farmers suggests that several pieces of information found in the letters gave the City the information it needed:

> "Pursuant to K.S.A. § 12-105b(d): (1) The letters from Dobratz and counsel supply the name and address of Farmers and its counsel; (2) the letters addressed fraud and negligence claims against all Employee Defendants and the factual ramifications arising from the City's claim the Individual Defendants acted without authorization; (3) [t]he letters identified the Mayor (Heldstab), City Clerk (Woodruff), and City Attorney (Zimmerman), along with the City's address; (4) [t]he letters from Dobratz and counsel explained the injury of non-payment to Farmers; and (5) Dobratz's letters explained the amounts due."

We note that some of the letters Farmers relies on were cited in its "additional facts," which the district court struck. Farmers contends it was error for the district court to strike these material facts. But, from the record, it appears that the district court did consider all of them because the court referred to the later letters when it was discussing possible fraud. The defendants do not dispute that the letters speak for themselves, so we will discuss them and their legal effect. But first, we must look at a more fundamental point.

*Farmers stumbles at the first hurdle.*

The statute not only specifies what the notice must contain, it also directs to whom the notice must be given. Trying to avoid this peril, Farmers argues that the City

24

designated its attorney, Catherine Logan, to receive all communications on this matter. Farmers argues that City officials received every piece of correspondence between Farmers and Logan. It cites three cases that purportedly hold that a person other than the city clerk or governing body of the city may receive notice. We are not convinced this is so.

We find nothing in the record that shows the City designated Logan to receive a K.S.A. 12-105b(d) notice. But even if the City had done so, this court has rejected the argument that the City may waive the requirement under K.S.A. 12-105b(d) of service on the clerk or governing body of the City. See *Zeferjohn v. Shawnee County Sheriff's Dept.*, 26 Kan. App. 2d 379, 381-83, 988 P.2d 263 (1999). For the same reason, whether the proper City officials eventually received all of the correspondence is immaterial.

Failure to serve notice on the proper official resolves a tort claim filed against a municipality. To its credit, Farmers candidly cites *Myers v. Board of Jackson County Comm'rs*, 280 Kan. 869, Syl. ¶ 2, 127 P.3d 319 (2006), in which our Supreme Court held that service of notice "on the county counselor or anyone else who is not the clerk or governing body of the municipality as specified in K.S.A. 2004 Supp. 12-105b(d) is not substantial compliance with the statute."

Indeed, the court held that the "substantial compliance" language did not authorize new judicially created methods of serving notice. *Myers*, 280 Kan. at 875-77. Thus, Myers' service of notice on the county counselor was a jurisdictional bar to his claim. 280 Kan. at 877; see *Huffman v. City of Prairie Village*, 980 F. Supp. 1192, 1206 (D. Kan. 1997); *Morgan v. Board of Doniphan County Comm'rs*, No. 117,538, 2017 WL 6063090, at *4, 6 (Kan. App. 2017) (unpublished opinion), *rev. denied* 308 Kan. 1595 (2018); *Meara v. Douglas County*, No. 107,471, 2013 WL 310363, at *8-9 (Kan. App. 2013) (unpublished opinion).

We recognize more support for this view. A panel of this court noted that

"[t]o the extent that the *Sleeth* court considered multiple writings in analyzing whether a party substantially complied with K.S.A. 2011 Supp. 12-105b(d), it did so in determining whether the content of the notice of claim complied with the statute, not in deciding whether the notice was served on the proper party." *Meara*, 2013 WL 310363, at *8.

Of course, some common-sense exceptions have been recognized by the courts. When the municipality had no designated clerk, service of notice on a person who served in a role consistent with that of a clerk, along with actual notice of the claim, constituted substantial compliance. See *Steed v. McPherson Area Solid Waste Utility*, 43 Kan. App. 2d 75, 77, 85-86, 221 P.3d 1157 (2010). But the *Steed* court distinguished *Myers*, acknowledging that "[c]learly the service of a notice of claim on a county counselor is not the same as service upon a clerk or the governing body as is required by the statute." *Steed*, 43 Kan. App. 2d at 85.

Another exception has been recognized when notice was to be served on the governing body of a school district. Service on the superintendent of the school district substantially complied with K.S.A. 12-105b(d) because the position of superintendent by statute had "charge and control of the public schools" of the school district. See *Orr v. Heiman*, 270 Kan. 109, 114-15, 12 P.3d 387 (2000). The court noted, "it obviously would have been better practice to mail the letter to the clerk." 270 Kan. at 114.

Finally, when notice is served on the city attorney with a copy to the city clerk, the claimant has complied with K.S.A. 12-105b(d). *Shaffer v. City of Topeka*, 30 Kan. App. 2d 1232, 1235, 57 P.3d 35 (2002).

None of those noted exceptions apply here.

Farmers has not convinced us that any statutory notice was served on the proper person. Basically, Farmers asks us to cut and paste various statements from many different letters and emails to make a statutory notice. But binding authority from our Supreme Court has found that notice to the city attorney does not amount to substantial compliance. And we are duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Kansas Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). The bottom line is that any letters that could reasonably be construed to give notice of a tort claim were only addressed to the city attorney. This is noncompliance with the statute—not substantial compliance as Farmers argues.

But our determination that Farmers did not comply with the statutory notice requirement does not end our deliberations. We must see if the individual defendants were acting within the scope of their employment with the City. If they were, then the City could have been liable for their actions, and then statutory notice was required for claims regarding their actions as well.

*Notice was legally required before a lawsuit could be legally filed.*

There is a fundamental legal point at play here. As we pointed out previously, notice under K.S.A. 2019 Supp. 12-105b(d) must be given for claims against municipal employees "which could give rise to an action brought under the Kansas tort claims act." Claims against municipal employees fall under the Kansas Tort Claims Act if the alleged damage by the municipality was "caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment." K.S.A. 75-6103(a). The municipality is vicariously liable for such acts or omissions. K.S.A. 75-6109. A judgment against a governmental entity constitutes a complete bar to an action against the employee. K.S.A. 75-6107(a). Elected officials are included in the definition of employee. K.S.A. 75-6102(d)(1)(A).

27

If the individual defendants were acting outside the scope of their employment, then Farmers' claims would not support a cause of action under the Kansas Tort Claims Act and, thus, no notice before suing the individuals would be necessary. See *Parisi v. Unified Government of Wyandotte County*, No. 118,284, 2018 WL 5728439, at *8 (Kan. App. 2018) (unpublished opinion), *rev. denied* 309 Kan. 1349 (2019).

We first look at how the district court addressed this issue. Then, we show how both sides have been inconsistent on this point. But then, our review of the caselaw guides us to a decision.

When the district court looked at this issue, it found that there were no facts to show Heldstab, Woodruff, and Zimmerman were "anything but employees in the legal sense."

> "[N]o facts have been put forth to indicate that the defendants stepped outside their employment in order to [commit] actionable torts against [Farmers].
>      . . . .
> "[T]he Court finds that the tort claims against [the] City all arise out of the execution and attestation of the guaranty or the legal opinion rendered by employees of the City acting in the scope of their employment."

The court found that only the pleadings supported Farmers' assertion that the defendants acted outside their employment. Thus, the tort claims fell under the Kansas Tort Claims Act.

Farmers contends it remains a disputed fact whether the individual defendants were acting within the scope of their employment because the City has switched positions on this question.

28

From this record, it appears the parties' position on whether these individuals were acting within the scope of their employment has been fluid. Before it was sued, the City determined that the guaranty was never approved by the City Commission or by public vote, and Zimmerman's opinion letter was "erroneous." In its answers to interrogatories, the City stated that Heldstab was not acting under any authority granted by the City Commission when the guaranty was signed. The City also stated that Zimmerman was not acting under any authority granted by the City Commission in preparing and sending his opinion letter. Then in its motion for summary judgment, Farmers alleged that the individual defendants *were* acting within the scope of their employment when they executed and attested to the guaranty and sent the opinion letter. In responding to Zimmerman's cross-claim for indemnification, the City denied that Zimmerman was acting within the scope of his employment.

After the defendants filed motions for summary judgment based on Farmers' failure to file a K.S.A. 12-105b(d) notice, Farmers alleged the defendants were maybe *not* acting within the scope of their employment. Later, at the motion hearing, the City offered to stipulate that the individual defendants were acting within the scope of their employment.

In other words, the parties have taken whatever position on this matter that was best for them at the time.

We must look to caselaw for guidance on this question. The cases point us in a different direction—we look not at the nature of the act of the employee— but look to see whose business was being promoted.

To determine whether an employee was acting within the scope of employment, courts consider three factors—who benefits, the authority to act, and the foreseeability of the actions:

29

"(1) [W]hether the act by the employee was done for the employee's personal benefit or in furtherance of the state's business;

"(2) whether there was express or implied authority to perform the act in question; and

"(3) whether the employee's act was reasonably foreseeable by the State." *Commerce Bank of St. Joseph v. State*, 251 Kan. 207, 215, 833 P.2d 996 (1992).

The Supreme Court then explained this ruling. The test depends not on whether the injurious act of the employee was willful and intentional or unintentional, but whether the employee was acting in the prosecution of the employer's business and within the scope of the employee's authority, or had stepped outside that business and done an individual wrong. *Commerce Bank of St. Joseph*, 251 Kan. at 215.

Our Supreme Court has further held that an employee is acting within the scope of his or her employment when performing services for which he or she has been employed or when "'doing anything which is reasonably incidental'" to the employment. *Williams v. Community Drive-In Theater, Inc.*, 214 Kan. 359, 364, 520 P.2d 1296 (1974). "The test is not necessarily whether the specific conduct was expressly authorized or forbidden by the employer, but whether such conduct should have been fairly foreseen from the nature of the employment and the duties relating to it." 214 Kan. 359, Syl. ¶ 2.

An employer is liable for reckless, willful, intentional, wanton, or malicious acts of its employees and for heedless and careless acts if they are committed "while the employee is acting in the execution of his authority and within the course of his employment, or with a view to the furtherance of his employer's business, and not for a purpose personal to the employee." *Williams*, 214 Kan. 359, Syl. ¶ 3. Thus, courts consider whether the employee was motivated by personal reasons such as malice or spite or by a desire to accomplish an unlawful purpose rather than to further the employer's business. 214 Kan. at 366.

30

Whether an employee is acting within the scope of his or her employment is generally a question of fact, but if only one reasonable conclusion can be drawn from the evidence, the court can decide the issue as a matter of law. *Wayman v. Accor North America, Inc.*, 45 Kan. App. 2d 526, Syl. ¶ 3, 251 P.3d 640 (2011).

In *Williams*, whether a drive-in theater employee's discharge of a shotgun at a patron was within the scope of employment sufficiently raised a question of fact for jury determination because part of the employee's duties included preventing unauthorized entry, and she was motivated by a desire to further theater interests rather than personal interests. 214 Kan. 367-68.

In *Commerce Bank of St. Joseph*, the court found as a matter of law that a state employee's acceptance of a bribe was not within the employee's scope of employment. 251 Kan. at 215.

In *McCormick v. Shawnee County Board of Comm'rs*, 272 Kan. 627, 630, 646, 35 P.3d 815 (2001), the plaintiff did not provide specific, nonconclusory allegations that allowed the court to find that an assistant district attorney acted outside the scope of her employment. She had signed a probable cause affidavit and filed a criminal complaint against the plaintiff for stalking. The plaintiff's allegations tied the defendant's actions only to her employment as assistant district attorney and did not make claims against her individually. Thus, the court held she was acting within the scope of her employment on a motion to dismiss for failure to state a claim due to discretionary function immunity. 272 Kan. at 647.

*We apply these rules here.*

Grounded in these principles developed by these cases, we turn to the facts here. First, Farmers does not argue that executing loan agreements and giving legal opinions on

31

such agreements are outside the respective duties of a mayor and a city attorney. The undisputed facts support the holding that the individual defendants acted within the scope of their employment.

They were employees or elected officials at the time. The guaranty was an agreement between the City and Farmers. Heldstab signed the guaranty on behalf of "The City of Junction City" as "Mayor." Woodruff attested his signature as the "City Clerk." Zimmerman's opinion letter was written on letterhead for the office of the City Attorney. Zimmerman began the letter by stating, "I am the City Attorney for the City of Junction City, Kansas. In that capacity I have reviewed the documents signed by the Mayor of the City of Junction City." While none of the individual defendants remember the guaranty, their standard practice was for the mayor and city clerk to sign detached signature pages of documents after city commission meetings and the city manager would assemble the documents later.

Even though the individual defendants disagree, the record does show some facts suggesting they acted outside the scope of employment. After all, the guaranty was never approved by the city commission or by a public vote. But that does not resolve the issue. The cases call for us to look at the motivation of the employees when reviewing their actions that are complained about. Who would benefit?

No evidence shows that the individual defendants were motivated by a personal purpose, such as the taking of a bribe in *Commerce Bank of St. Joseph*. With no express authority to execute the guaranty, the question was whether such conduct could be fairly foreseen from the nature of the defendants' employment and the duties relating to it. See *Williams*, 214 Kan. 359, Syl. ¶ 2. The individual defendants acted only in their municipal roles. There is no evidence of personal gain as an explanation for their actions. Their actions were foreseeable as the actions of municipal officers and employees.

We hold that these undisputed facts are enough to support a grant of summary judgment that statutory notice was required before Farmers could file this lawsuit.

*A final point*

Farmers contends, without citing any authority, that the individual defendants can be sued in their personal capacities even if the employees were acting within the scope of employment. We find this point abandoned. Issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018).

To sum up, it is clear to us that Farmers did not recognize, nor appreciate, the perils of doing business with the City. Municipal corporations, which are creatures of statute, are governed by many particular statutes that are not applicable to others. These laws command what cities in Kansas can and cannot do. Likewise, they constrain those who do business with them.

Affirmed.